Volume 1 of 2

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARY B. GUNNELLS; WILLIAM A.
GUNNELLS; TELE TECH CORPORATION;
CYNTHIA MULLINAX; W & W
TRUCK AND TRACTOR COMPANY,
INCORPORATED; JERRY FREEMAN; AAA
TRANSMISSIONS, INCORPORATED;
PAMELA B. ROBERTSON;
AVIONICS/SEAONICS INTERNATIONAL,
INCORPORATED; JAMES E. CASSLEMAN;
LARRY STRICKLAND; BRENDA
WORKMAN; HELEN CLARK; BOBBY F.
BUCHANAN; JOANNE BUCHANAN;
BRIAN HANSEN; JAMES E. WISE; JOHN
N. STANLEY; DANIEL L. DRIGGERS;
BRENDA VOWELS; DAVID J. VOWELS;
LIVINGSTON AUTO PARTS,
INCORPORATED; PHILIP LIVINGSTON;
LUKES CYCLE SERVICES,
INCORPORATED; JEFF LUCARELLI; HH
MOORMAN & SONS; HAROLD
MOORMAN; OAKLAND CLUB; MARK B.
BUXTON; STYLON OF CHARLESTON;
MARY PARKER; TERRY HENSLEY;
EARL SINGLETARY; ORA SINGLETARY,
individually and as representatives
of all persons and entities similarly
situated,

> No. 01-2419

*Plaintiffs-Appellees,*

v.

HEALTHPLAN SERVICES, INCORPORATED, individually and as successor in interest to Third Party Claims Management, Incorporated; THIRD PARTY CLAIMS MANAGEMENT, INCORPORATED,

*Defendants-Appellants,*

and

FIDELITY GROUP INC.; INTERNATIONAL WORKERS GUILD, INCORPORATED; NATIONAL ASSOCIATION OF BUSINESS OWNERS AND PROFESSIONALS; IWG HEALTH AND WELFARE FUND; FIDELITY CLAIMS MANAGEMENT, INCORPORATED; EXECUTIVE CONSULTANTS INSURANCE AGENCY; RAYMOND R. OLIVI; JOHN BRANHAM; STEVEN BROUGHTON; JOHN COLLINS; REX CULBERTSON; ROBERT DAVIES; RICHARD DEXTAZE; KENNETH EVERY ANDREWS; FRANKIE FORT; ROBERT GERMAN; GARY GEITLER; MELISSA GEITLER; MARTIN T. GEITLER; MICHAEL D. GEITLER; GEORGE GRADEK; HUBERT G. GREENE; PHILLIP S. HODGSEN; EARL ISABELL; STEPHEN LACY; FREDERICK MALONE; DAVID E. MARTIN; MICHAEL MASSEY; HENRY MERCHANT; TINA MESSINGER; MICHAEL R. REQUA; BRUCE ROWAN; PAMELA REGOPOULUS; BRUCE RYALS; BARBARA A. SCOTT; HENRY K. SKINNER, JR.; ELMER STONE; KENNETH R. TALLMADGE; LEE TAYLOR;

MICHAEL THOMAS; SCOTT TODD; ARNOLD H. VALENTINE; RICHARD M. VANN; LEWIS H. WADE; DAVID M. WHITE; HERBERT L. WILLIAMS; BEN L. WELLS; JACK E. WILSON, individually and in his representative capacity; ANCHOR INSURANCE AGENCY; BRANHAM AND GEITLER ASSOCIATES; DIVERSIFIED INSURANCE; LEGEND EQUITIES CORPORATION; FINANCIAL BENEFITS, INCORPORATED; THE TAYLOR AGENCY INCORPORATED; TRUETT AND ASSOCIATES; COLONIAL LIFE & ACCIDENT INSURANCE COMPANY, a UNUM Company; DWAYNE A. SAMUELS; EUGENE O. DUNCAN; DAVID SPOONER; CHARLES L. BRADLEY; TERRENCE E. RHUE; NOEL SHAW; PAUL D. ASKEW; PHILLIP STASHIN; KEN AVERIES,

*Defendants.*

MARY B. GUNNELLS; WILLIAM A.
GUNNELLS; CYNTHIA MULLINAX;
JERRY FREEMAN; PAMELA B.
ROBERTSON; JAMES E. CASSLEMAN;
LARRY STRICKLAND; BRENDA
WORKMAN; HELEN CLARK; BOBBY F.
BUCHANAN; JOANNE BUCHANAN;
BRIAN HANSEN; JAMES E. WISE; JOHN
H. STANLEY; DANIEL L. DRIGGERS;
BRENDA VOWELS; DAVID J. VOWELS;
PHILIP LIVINGSTON; JEFF LUCARELLI;
HAROLD MOORMAN; MARK B.
BUXTON; MARY PARKER; TERRY
HENSLEY; EARL SINGLETARY; ORA
SINGLETARY, individually and as
representatives of all persons and
entities similarly situated; W & W
TRUCK AND TRACTOR COMPANY,
INCORPORATED; LUKES CYCLE
SERVICES, INCORPORATED; AAA
TRANSMISSIONS, INCORPORATED;
LIVINGSTON AUTO PARTS,
INCORPORATED; HH MOORMAN &
SONS; TELE TECH COMPANY,
INCORPORATED; AVIONICS SEAONICS
INTERNATIONAL, INCORPORATED;
OAKLAND CLUB; STYLON OF
CHARLESTON, entities similarly
situated,
              *Plaintiffs-Appellees,*

                    v.

No. 01-2420

MICHAEL R. REQUA; ARNOLD H. VALENTINE; FINANCIAL BENEFITS, INCORPORATED; LEWIS H. WADE; BRUCE RYALS; GEORGE GRADEK; TINA MESSINGER; KENNETH EVERY ANDREWS; RAYMOND R. OLIVI; EXECUTIVE CONSULTANTS INSURANCE AGENCY; MICHAEL MASSEY; ANCHOR INSURANCE AGENCY; JOHN COLLINS, individually and in their representative capacities,

*Defendants-Appellants,*

and

FRANKIE FORT; FIDELITY GROUP INC.; INTERNATIONAL WORKERS GUILD, INCORPORATED; NATIONAL ASSOCIATION OF BUSINESS OWNERS AND PROFESSIONALS; IWG HEALTH AND WELFARE FUND; FIDELITY CLAIMS MANAGEMENT, INCORPORATED; JOHN BRANHAM; STEVEN BROUGHTON; REX CULBERTSON; ROBERT DAVIES; RICHARD DEXTAZE; ROBERT GERMAN; GARY GEITLER; MARTIN T. GEITLER; GARY GEITLER; MICHAEL D. GEITLER; HUBERT G. GREENE; PHILLIP S. HODGSEN; EARL ISABELL; STEPHEN LACY; FREDERICK MALONE; DAVID E. MARTIN; HENRY MERCHANT; BRUCE ROWAN; PAMELA REGOPOULUS; BARBARA A. SCOTT; HENRY K. SKINNER, JR.; ELMER STONE; KENNETH R. TALLMADGE; LEE TAYLOR;

MICHAEL THOMAS; SCOTT TODD;
RICHARD M. VANN; DAVID M.
WHITE; HERBERT L. WILLIAMS; BEN
L. WELLS; JACK E. WILSON;
BRANHAM AND GEITLER ASSOCIATES;
DIVERSIFIED INSURANCE; LEGEND
EQUITIES CORPORATION; THE TAYLOR
AGENCY, INCORPORATED; TRUETT AND
ASSOCIATES; COLONIAL LIFE &
ACCIDENT INSURANCE COMPANY, a
UNUM Company; HEALTHPLAN
SERVICES, INCORPORATED, individually
and as successor in interest to Third
Party Claims Management,
Incorporated; THIRD PARTY CLAIMS
MANAGEMENT, INCORPORATED;
DWAYNE A. SAMUELS; EUGENE O.
DUNCAN; DAVID SPOONER; CHARLES
L. BRADLEY; TERRENCE E. RHUE;
NOEL SHAW; PAUL D. ASKEW;
PHILLIP STASHIN; KEN AVERIES,
individually and in their
representative capacities,
                              *Defendants.*

Appeals from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-98-2659)

Argued: September 23, 2002

Decided: October 30, 2003

Before NIEMEYER, MOTZ, and KING, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Judge King concurred. Judge Niemeyer wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** William R. Lewis, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Charleston, South Carolina; James Y. Becker, HAYNSWORTH SINKLER BOYD, P.A., Columbia, South Carolina, for Appellants. Christian Hancock Hartley, RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, L.L.C., Charleston, South Carolina; Justin S. Kahn, KAHN LAW FIRM, Charleston, South Carolina, for Appellees. **ON BRIEF:** Charles R. Norris, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Charleston, South Carolina; John H. Tiller, Elizabeth J.V. Speidel, HAYNSWORTH SINKLER BOYD, P.A., Columbia, South Carolina; H. Michael Bowers, YOUNG, CLEMENT, RIVERS & TISDALE, Charleston, South Carolina; Thomas J. Keaveny, II, SIMONS & KEAVENY, Charleston, South Carolina, for Appellants.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal presents the question of whether the district court abused its discretion in conditionally certifying a class action in a suit brought by purchasers and beneficiaries of a multi-employer health care plan for claims growing out of the plan's collapse. The district court conditionally granted class certification against the plan's claims administrator, Healthplan Services Inc., as successor in interest to Third Party Claims Management, Inc. (collectively, "TPCM") and against individual and corporate insurance agents who marketed and sold the plan. The court properly applied controlling legal principles and made well-supported factual findings supporting its decision to certify a class action against TPCM; thus, we see no abuse of discretion in that decision. However, because the court rested its class certi-

fication against the individual agents on findings grounded in a misapprehension of governing law, we must conclude that the court did abuse its discretion in certifying those separate class actions. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Since this is an interlocutory appeal, filed even before the parties have completed discovery, the facts surrounding the claims of the purchasers and beneficiaries (collectively, "Plaintiffs") have not been fully developed. Thus, the record to date reveals only the following rough outline of the events leading up to the present lawsuit.

Sometime in 1995, Fidelity Group, Inc., the National Association of Business Owners and Professionals ("NABOP"), and the International Workers Guild, Inc. ("IWG"), created the IWG Health and Welfare Fund (the "Fund"), which in turn offered a health care and dental plan (the "Plan") to interested purchasers. From August 1996 until June 1997, when the South Carolina Department of Insurance ordered marketing to cease, the agents marketed and sold the Plan. Although it was purportedly marketed as an ERISA plan, the Plan never complied with ERISA requirements.

In April 1995, Fidelity hired TPCM to process claims under the Plan as a third party administrator. TPCM failed to keep pace with the claims received, creating a huge backlog of unprocessed claims. In May 1997, Fidelity fired TPCM for incompetence and attempted to transfer the claims management process to an in-house operation. Assertedly, difficulties in obtaining data from TPCM and the massive backlog it had created ultimately led to the Plan's collapse.

Approximately 1400 employees and their families contracted for coverage under the Plan. As many as 2900 claims have gone unpaid, amounting to millions of dollars in unpaid medical bills.

In August 1998, Plaintiffs sued Fidelity Group, NABOP, IWG, and the Fund (collectively, "the Fidelity Defendants") in state court in South Carolina. The defendants removed the case to federal court.

Later in the year, Plaintiffs amended their complaint to add TPCM and the agents as defendants. In that complaint, Plaintiffs allege that one or more of the defendants engaged in negligent undertaking, fraud, negligent misrepresentation, breach of contract, civil conspiracy, and violated the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-140 (1985), and Title IX of the Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961-68 (West 2000 & Supp. 2000) ("RICO").[1] In short, Plaintiffs assert that the agents breached contractual and fiduciary duties owed to the Plaintiffs and misrepresented the Plan's attributes through their marketing efforts, which caused Plaintiffs to purchase the woefully deficient Plan. As to TPCM, Plaintiffs allege that it mismanaged administration of the Plan, created a huge backlog of unpaid claims, did not timely transfer information, and made it impossible to forecast rate increases accurately, resulting in the Plan's collapse and failure to pay hundreds, if not thousands, of health care claims. In their prayer for relief, Plaintiffs

> seek recovery for all legally allowable damages including refunds of premiums paid, payment of outstanding medical/dental bills, reimbursement for medical bills paid by Plaintiffs where treatment occurred while Plaintiff[s were] covered by the Plan, compensation for injury to credit, compensation for injury to ability to obtain credit, time spent and costs incurred attending to the difficulties resulting from the failure of the Plan, loss of enjoyment of life attendant to the stress caused by the failure of the Plan.

Plaintiffs also seek punitive damages.

---

[1]Also in 1998, the United States Department of Labor filed suit against the Fidelity Group for actions relating to the Fund in the Eastern District of New York. That court issued an order on January 8, 1999 staying all pending actions against the Fund. Pursuant to this order, the district court in South Carolina issued a stay of the proceedings in the present case. After the New York court clarified that its stay reached only the Fidelity Defendants, the district court in the case at hand lifted the stay with respect to the "non-Fidelity Defendants" — TPCM and the agents. Ultimately, on the advice of a court-appointed fiduciary, the New York court ordered the Plan terminated effective January 31, 1999.

After some initial discovery, Plaintiffs moved for certification of a class, pursuant to Federal Rule of Civil Procedure 23(b)(3), of "all entities and people who purchased the Fidelity Plan or who were provided with coverage under the Fidelity Plan in South Carolina at any time." In addition, with respect to certain "agent-specific" claims, Plaintiffs moved for certification of subclasses consisting of "all entities and persons who purchased the Fidelity Plan from or were provided the Fidelity Plan by that particular agent in South Carolina."

After refusing to certify any claims under the South Carolina Unfair Trade Practices Act, *see* S.C. Code Ann. § 39-5-140(a) (West 1985) (a person "may bring an action individually, but not in a representative capacity, to recover actual damages"), the district court granted Plaintiffs' class certification motion in large part. *Gunnells v. Fidelity Group, Inc.*, No. 2:98-2639-23 (D.S.C. Sept. 28, 2001) (located at J.A. 1244-1271). The court conditionally granted Plaintiffs' motion for class certification with respect to their mismanagement claim against TPCM. Moreover, although the court declined to certify Plaintiffs' civil conspiracy and RICO claims against the agents, it did certify subclasses to permit Plaintiffs to pursue their four theories of liability — negligent undertaking, fraud, negligent misrepresentation, and breach of contract — via separate class actions against each of the twenty-three agents that assertedly sold insurance to a named class representative, withholding "ruling on the certification of the agent classes for which there [wa]s currently no representative." J.A. 1265 n.21.

Pursuant to Federal Rule of Civil Procedure 23(f), both TPCM and a number of agents[2] (collectively, "the Agents") petitioned for permission to file an interlocutory appeal, which we granted.

---

[2]Originally, fourteen agents appealed the class certification order. While the appeal was pending, eight agents moved to withdraw their appeal because they had reached a settlement with the class. We now grant the eight agents' motion to withdraw their appeal and remand to the district court for consideration of the settlement proposal pursuant to Federal Rule of Civil Procedure 23(e) and in light of this opinion. *See* Fed. R. Civ. P. 23(e); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (articulating different standard for settlement-only class certification). Our holding with respect to the district court's certification of subclasses against individual agents, therefore, pertains only to the six agents whose appeals remain before us.

## II.

Class actions must meet several criteria. First, the class must comply with the four prerequisites established in Rule 23(a): (1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Second, the class action must fall within one of the three categories enumerated in Rule 23(b); here Plaintiffs seek to proceed under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

If a lawsuit meets these requirements, certification as a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also "afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions." 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.02 (3d ed. 1999). Thus, federal courts should "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" I*n re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989).

To be sure, Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions. This is because these suits involve situations where "class-action treatment is not as clearly called for." Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (b)(3)). However, as the Supreme Court has noted, the predominance and superiority requirements in Rule 23(b)(3) do not foreclose the possibility of mass tort class actions, but merely ensure that class certification in such cases "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Adv. Comm. Notes, 28 U.S.C. App. at 697). For these very reasons, we have expressly "embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole." *Cen-*

*tral Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1992) (citation, internal quotation marks, ellipses, and alterations omitted).

Furthermore, "[d]istrict courts have wide discretion in deciding whether or not to certify a class and their decisions may be reversed only for abuse of discretion," *id.* (internal quotation marks omitted), recognizing, of course, that this "discretion must be exercised within the framework of Rule 23." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). Our review is particularly deferential in a case like this — involving an interlocutory appeal of a conditional class certification. *See Central Wesleyan*, 6 F.3d at 186 (noting that "[t]he tentative, limited nature of the conditional certification . . . counsels in favor of affirmance.").[3]

With these principles in mind, we turn to the case at hand. Plaintiffs' claims against TPCM and the Agents rest on different bases. Accordingly, like the district court, we consider class certification with respect to TPCM and the Agents separately.

### III.

The district court conditionally certified the plaintiff class against TPCM allowing the class to pursue a single claim: "that TPCM violated its duties, both contractual and at law, as third party administrator of the Plan and such conduct was a cause of the Fidelity Plan's failure," and that "failure directly injured Plaintiffs and the absent class members." J.A. 1249.

---

[3]Thus, in paying heed to "the 'conditional' aspect of [the] certification" here, we do not, as the dissent asserts, "default[ ] our responsibility" or "employ[ ] a backward burden." *See post* at 83 n.8. Rather, we simply follow *Central Wesleyan*'s well-established directive. The dissent not only ignores that directive, it also contends (without explanation) that other "portions" of *Central Wesleyan* may have been "superseded" by *Amchem*. *See post* at 86. We disagree. In fact, in *Central Wesleyan*, the court carefully recognized and sought to avoid the problems created by the lower court in *Amchem*. *See Central Wesleyan*, 6 F.3d at 182, 189 (noting that "the Third Circuit's ongoing experiment in class certification [in the *Amchem* litigation] has not been an unqualified success").

A.

We note at the outset both that the certification order concerning TPCM is strikingly similar to the certification order we upheld in *Central Wesleyan and* that the district court carefully followed the framework approved in *Central Wesleyan*, 6 F.3d at 183-186. Here, as in *Central Wesleyan*, "the district court conducted a straightforward analysis of the class certification requirements under Fed. R. Civ. P. 23(a) and 23(b)(3)," determined that each requirement had been met, and "supported each of its 23(a) and 23(b)(3) holdings with detailed findings." *Id.* at 183, 186.

First, the district court found that the "1400 employees plus their families" covered by the Plan, with possibly 2900 unpaid claims, "easily" satisfied Rule 23(a)(1)'s numerosity requirement. J.A. 1248. *Cf. Central Wesleyan*, 6 F.3d at 183 (noting district court's finding "that some 480 potential class members would easily satisfy the numerosity requirement"). The court found Rule 23(a)(2) commonality and Rule 23(a)(3) typicality because of the many "factual and legal issues pertaining to TPCM's conduct . . . common" to "all Plaintiffs and class members," such as: "(1) facts surrounding how TPCM managed its operations; (2) whether it created a backlog of claims; ([3]) whether it failed to enter claims into its system; ([4]) whether it breached its contractual duties; [and (5)] whether TPCM's alleged negligence proximately caused Plaintiffs' injuries by contributing to the failure of the Plan." J.A. 1254-55. The district court recognized that some of the Plaintiffs' damages claims might require "individual inquiry" but found that, if necessary, those issues could be bifurcated for individual trials as they were in *Central Wesleyan*, 6 F.3d at 188-90. *See* J.A. 1254. With regard to Rule 23(a)(4) adequacy, the court recognized that "class representatives" must "be part of the same class and possess the same interest and suffer the same injury as the class members" and found that in this case the named plaintiffs satisfied these requirements, noting particularly that no "potential conflict existed" among class members. *Id.* at 1257; *cf. Broussard v. Meineke*, 155 F.3d 331, 337-38 (4th Cir. 1998) (holding "manifest conflicts of interest" among members of class precludes class certification).

As in *Central Wesleyan*, 6 F.3d at 183-84, the district court next turned to the Rule 23(b)(3) requirement that "questions of law or fact

common to members of the class predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods to the fair and efficient adjudication of the controversy," and "specifically addressed the four matters the Rule lists as pertinent to these findings." First, the court found that the class members had evidenced "no great deal of interest . . . in individual litigation," noting as support for this finding that although "1400 potential litigants exist," there was a "dearth of individual cases filed until now." J.A. 1260. Second, the court held that in view of the few pre-existing cases, a class action would be productive. *Id.* at 1261. Third, the court concluded that "the flexibility and control of this action in one forum [the federal district court in South Carolina] provides the benefits which outweigh the method of individual litigation." *Id.* at 1260.

Finally, and again as in *Central Wesleyan*, 6 F.3d at 184, the district court acknowledged "particular concern" with the fourth factor: "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). The court found that bifurcation of a few issues (*e.g.*, some damages issues) requiring individualized determination would assist it in managing the class action, but recognized that, even so, "given the number of possible class members in this action . . . manageability could quickly dissipate." J.A. 1260. Accordingly, the district court resolved only to grant conditional certification of the class and explained that it would not hesitate to decertify the class if it should prove unmanageable. *Id.* at 1260-61. (We note that in *Central Wesleyan*, 6 F.3d at 188-89, we upheld a district court's conditional certification order in the face of far more formidable management concerns, *i.e.*, not only the possible need for individualized damage determinations, but also a "daunting number of individual issues" necessary to "establish liability," including determination of "comparative fault" among numerous defendants, "[d]ifferent time bar defenses" with respect to differently positioned defendants, and the necessity of application of the laws of different jurisdictions.)

Thus, here, as in *Central Wesleyan*, the district court carefully considered the requirements of Rule 23(a) and (b)(3) and made specific and detailed findings as to compliance with those requirements. In doing so, the court followed the admonition in *A.H. Robins*, 880 F.2d

at 740, to "take full advantage of the provision in [Rule 23(c)(4)] permitting class treatment of separate issues . . . to reduce the range of disputed issues" in complex litigation, and most especially the teachings of *Central Wesleyan* itself, and then exercised its discretion to grant conditional class certification.

As in *Central Wesleyan*, we must acknowledge that "[s]uch an approach has its promise." 6 F.3d at 185. First, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making "the adjudication of [the] matter through a class action . . . superior to no adjudication of the matter at all." *See* 5 *Moore's Federal Practice* § 23.48[1] (1997). Thus, class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action. As the Supreme Court put the matter, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617 (citation omitted).

Moreover, as in *Central Wesleyan*, class certification in this case seems likely to reduce litigation costs through the "consolidation of recurring common issues." 6 F.3d at 185. Such recurring common issues make up the heart of Plaintiffs' case against TPCM, *i.e.*, whether TPCM mismanaged the Fund, whether TPCM's mismanagement was a proximate cause of the Plan's collapse, whether the Fidelity Defendants also mismanaged the Fund, and whether the Fidelity Defendants' mismanagement was an intervening cause of the Plan's collapse sufficient to relieve TPCM of liability. Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and re-litigation of many similar, and even identical, legal issues.

Consolidation of these recurring common issues will also conserve important judicial resources. The record in this case already reveals that a trial on these common issues alone is likely to be lengthy, requiring extensive exploration of the Plan's collapse and TPCM's role. The prospect of a long trial, with the possibility of a large damage award may also encourage settlement, which "should be a factor,

and an important factor, to be considered when determining certification." *Id.* at 186 (quoting *A.H. Robins*, 880 F.2d at 740).

Furthermore, class certification "provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects *the defendant* from inconsistent adjudications." 5 *Moore's Federal Practice* § 23.02 (1999) (emphasis added). This protection from inconsistent adjudications derives from the fact that the class action is binding on all class members. *See* Fed. R. Civ. P. 23(c)(2)(B). By contrast, proceeding with individual claims makes the defendant vulnerable to the asymmetry of collateral estoppel: If TPCM lost on a claim to an individual plaintiff, subsequent plaintiffs could use offensive collateral estoppel to prevent TPCM from litigating the issue. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (concluding that the use of offensive collateral estoppel should not be precluded in federal courts). A victory by TPCM in an action by an individual plaintiff, however, would have no binding effect on future plaintiffs because the plaintiffs would not have been party to the original suit. *See Allen v. McCurry*, 449 U.S. 90, 95 (1980) ("[T]he concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue.") (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). Class certification thus promotes consistency of results, giving defendants the benefit of finality and repose.[4]

Indeed, it appears at this juncture that the single claim certified against TPCM — mismanagement of the Plan resulting in its ultimate collapse similarly affecting a large group of people in a single state — seems even better suited for class treatment than the diverse issues against many defendants involving the laws of a number of states that we certified in *Central Wesleyan*.

---

[4]Thus, TPCM benefits more from class certification than the Plaintiffs in some ways, since the effect of class certification on collateral estoppel redounds to the benefit of defendants, not plaintiffs, whereas the beneficial economies of class certification redound to all parties, as well as to the courts. One suspects, therefore, that TPCM resists certification in an attempt to keep Plaintiffs with relatively small claims out of court altogether — precisely the problem the class action mechanism was designed to address. *See Amchem*, 521 U.S. at 617.

B.

Notwithstanding these substantial advantages to class certification, TPCM, like the defendants in *Central Wesleyan*, "argue[s] that the district court committed multiple errors in conditionally certifying the class." 6 F.3d at 184. We disagree.

1.

TPCM's principal argument, which it sounds again and again, is that the probable necessity of individual proof of some of the claimed damages by individual class members prevents Plaintiffs from meeting Rule 23's requirements. Initially, TPCM contends that individualized damages determinations destroy commonality, typicality, and predominance.[5] But Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations. *See* Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (c)(4)) (noting that Rule 23 (c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with "the members of the class . . . thereafter . . . required to come in individually and prove the amounts of their respective claims."); *see also* 5 *Moore's Federal Practice* § 23.23[2] (1997) ("[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality.").

---

[5]TPCM couches this argument as one involving "due process" but cites no authority indicating that this concept applies in this context. In any event, TPCM contends that "due process" requires the district court to conduct an individual inquiry to determine the benefit amount to which each class member was rightfully entitled and if a member was not deprived of any benefit as a result of the Plan's collapse, then TPCM could not be said to be the proximate cause of that member's injury. Substantively, this argument is identical to the contention, discussed in text, that, TPCM must be allowed the opportunity to show that an individual class member did not suffer any damages. As explained above, affording TPCM this opportunity does not destroy Plaintiffs' ability to satisfy the requirements of Rule 23.

Indeed, "[i]n actions for money damages under Rule 23(b)(3), courts *usually* require individual proof of the amount of damages each member incurred." *Id.* at § 23.46[2][a] (1997) (emphasis added). When such individualized inquiries are necessary, if "common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied." *Id.*

This is precisely the situation here — "common questions [do] predominate over individual questions as to liability." *Id.* Plaintiffs requested, and the district court certified, class claims against TPCM that rest on a single theory: that TPCM's mismanagement of claims contributed to the ultimate collapse of the Plan and so caused Plaintiffs' damage. Whether TPCM breached its contract to administer and timely pay claims under the Plan, whether Plaintiffs are third party beneficiaries of that contract, whether TPCM otherwise owed a fiduciary duty of care to Plaintiffs, whether it breached that duty, whether it mismanaged claims at all, and whether its mismanagement contributed to the ultimate collapse of the Plan — are issues common to all potential class members, and do not require any individualized inquiry.

Of these issues, the only one that TPCM even contends is not common to all class members is that of causation. TPCM argues that an individualized inquiry is necessary to determine whether its mismanagement proximately caused Plaintiffs' injury, arguing that Plaintiffs "provided absolutely no credible evidence that any TPCM action or inaction proximately caused damages to them." TPCM's argument fails for several reasons.

First, the sufficiency of the evidence as to proximate cause presented by Plaintiffs goes to the merits of Plaintiffs' case — an issue the Supreme Court has held courts may not consider in ruling on a motion for class certification. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

Second, to the extent that TPCM argues that *it* was not the proximate cause of the Plan's collapse, the argument actually provides further support for proceeding with this case as a class action. As discussed earlier, class treatment will avert the necessity for hundreds

of individual trials in which core issues — such as TPCM's assertion that it was not a proximate cause of the Plan's collapse — would be re-litigated, requiring testimony by the same witnesses, duplicative discovery efforts, etc. If TPCM succeeds in establishing that it was not the proximate cause of the Plan's collapse, it will enjoy the preclusive effects of this decision against all class members, rather than be disadvantaged by the asymmetric application of collateral estoppel. *Compare* Fed. R. Civ. P. 23(c)(2)(B) (making class action binding on all members) *with Allen v. McCurry*, 449 U.S. at 95 (noting that collateral estoppel "cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue" (citations omitted)).

Third, to the extent that TPCM's causation argument is that individual inquiry is necessary to establish whether the collapse of the Plan caused Plaintiffs any damages, this is precisely the same argument made by almost all defendants in mass tort cases: determining damages will require an individualized inquiry. Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will *not* defeat class certification. *See Central Wesleyan*, 6 F.3d at 189; *Hill v. W. Elec. Co., Inc.*, 672 F.2d 381, 387 (4th Cir. 1981) ("Bifurcation of . . . class action proceedings for hearings on . . . damages is now commonplace."); *Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 566 (E.D. Va. 1999) (collecting cases). As one court explained, "Quantitatively, almost by definition there will always be more individual damages issues than common liability issues . . . . Qualitatively, however, . . . liability issues" may "far exceed in complexity the more mundane individual damages issues." *In re Honda Motor Co.*, 979 F. Supp. 365, 367 (D. Md. 1997); *see also In re Amer. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996) (stating that commonality test is "qualitative rather than quantitative" (citation omitted)). So it is here. The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.

Moreover, the damage calculations in this case do not appear to be particularly complex, unlike the calculations in those cases in which courts have found that numerous complicated individual damage inquiries predominated over common issues. *Cf. Windham v. Am.*

*Brands, Inc.*, 565 F.2d 59, 66-67, 72 (4th Cir. 1977) (affirming denial of class certification because of overwhelming predominance of thousands of individualized damage questions). In fact, Plaintiffs' claims for punitive damages do not require *any* individualized inquiry at all because this damage calculation would be based solely on *TPCM*'s conduct. In addition, it appears that a court-appointed fiduciary has already calculated most of the Plaintiffs' claims for medical bills using the same computer program that TPCM and Fidelity used to evaluate claims. Thus, in many cases there is likely to be little or no dispute over the amount to which an individual class member is entitled for unpaid medical claims. Similarly, if the court determines that Plaintiffs are entitled to a refund of premiums paid, these amounts could be quickly and easily determined.

Plaintiffs' other damages claims — those relating to injury to credit, time lost, and loss of enjoyment of life — may require individualized inquiry. But even considering Plaintiffs' claims against TPCM *as a whole*, we cannot conclude that the district court abused its discretion in finding that at this juncture common issues predominate over the individual issues that may be involved in resolving these claims. We note that the district court was fully aware of the possibility that individual issues, although currently subordinate to the common liability and damage issues, might in time predominate and the case prove unmanageable. The court expressly indicated its resolve to deal with this if it became a problem, and for this reason agreed only to certify the class action conditionally. Such care reflects assiduous respect for Rule 23's requirements, not an abuse of discretion.[6]

2.

TPCM's remaining arguments have even less merit and require little discussion. Specifically, TPCM argues that the named plaintiffs constitute inadequate class representatives because they purportedly

---

[6]TPCM reasserts its individualized damages argument when contending that the certified class lacks numerosity and superiority. The argument is no more persuasive in those contexts. Indeed, TPCM's repeated attempts to reprise the same argument testify to the fundamental weakness of its contention that the conditional class certification order constituted an abuse of discretion.

lack sufficient knowledge, and because alleged insurmountable conflicts exist within the class. TPCM also contends that the interest of certain individual class members in pursuing individual litigation defeats any argument that a class action provides a superior vehicle for adjudication of the claims. These arguments also fail.

The lack of knowledge contention is particularly meritless. It is hornbook law, as the district court recognized, that "[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." J.A. 1256 (quoting 32B Am. Jur. 2d *Federal Courts* § 1888 (1996) (footnotes omitted)); *see also Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) ("The Supreme Court in *Suorowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966) expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance.").

TPCM's argument as to insurmountable class conflicts fares no better. According to TPCM, the interests of the employer class members conflict with those of the employee class members because employees may wish to sue their employers for unpaid medical bills resulting from the collapse of the Plan.

To defeat the adequacy requirement of Rule 23, a conflict "must be more than merely speculative or hypothetical." 5 *Moore's Federal Practice* § 23.25[4][b][ii] (2002). In this case, no conflict exists that renders the named representatives inadequate. TPCM has not cited a single case in support of its contention that the employees would have viable claims against their employers for unpaid medical bills caused by the failure of a non-ERISA plan, no employee has filed such a claim, and South Carolina's three-year statute of limitations now bars such claims. *See* 7 S.C. Code Ann. § 15-3-530 (West Supp. 2002) (applying three-year statute of limitations to actions for, among other things, breach of contract and fraud).

Furthermore, even if an employee could bring such a claim against its employer, this would not require decertification. For a conflict of interest to prevent plaintiffs from meeting the requirement of Rule

23(a), that conflict "must be fundamental. It must go to the heart of the litigation." 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:14 (4th ed. 2002). Here, the employers and employees share common objectives and the same factual and legal positions. They have the same interest in establishing the liability of TPCM. Thus, any potential conflict does not go to the heart of their roles as class representatives. *See Uniondale Beer Co. v. Anheuser-Busch, Inc.*, 117 F.R.D. 340, 343 (E.D.N.Y. 1987) (finding that economic conflict between competitor class members in antitrust action did not render representatives inadequate because all class members sought to prove that defendants conspired to fix prices).[7]

In addition, the dissent suggests a conflict between those Plaintiffs who were not injured by the collapse of the Plan, but have "direct" claims against TPCM for a delay in payment, and those Plaintiffs with "indirect" claims against TPCM that derive from the collapse of the Plan. *Post* at 77-81. As the Plaintiffs have made abundantly clear on appeal, however, they do not seek class certification for any direct claims against TPCM. *See, e.g.*, Brief of Appellees at 14 ("Contrary to TPCM's assertions, Plaintiffs do not claim that TPCM improperly adjudicated particular claims. TPCM injured all Plan insureds because it was the cause of the collapse of the Plan."). To be sure, this position appears somewhat at odds with the Plaintiffs' original complaint. However, "[t]he federal rules effectively abolish the restrictive theory of the pleadings doctrine," which held that "a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all." 5 Charles Alan Wright & Arthur R. Mil-

---

[7]The dissent insists that an additional conflict exists between the employer class members and the employee class members based on the different remedies sought by each group. *See post* at 84-85. However, "[p]otential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy." *Hanrahan v. Britt*, 174 F.R.D. 356, 364 (E.D. Pa. 1997) (internal quotation marks and citation omitted); *see Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977) (finding that representation was adequate even though current gas station lessees and former lessees would ultimately seek different remedies); *see generally* 1 *Newberg on Class Actions* § 3:25, at 422-23 & n.4 (collecting cases). Therefore, any conflict in the forms of recovery sought by these groups of plaintiffs does not warrant decertification.

ler, *Federal Practice & Procedure* § 1219, at 188-89 (2d ed. 1990) (internal quotation marks and citation omitted). *Cf. post* at 80 ("[W]e should take the complaint as written."). This observation seems particularly apropos to actions proceeding under Rule 23, which provides that "an action may be brought *or maintained* as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4)(A) (emphasis added).

Furthermore, even if the Plaintiffs wanted to proceed with direct claims against TPCM, the only claim that the district court certified against TPCM is based on the theory that TPCM caused the collapse of the Plan. *See* J.A. 1249-50 ("Plaintiffs have alleged that TPCM's mismanagement of processing claims contributed to the failure of the Fidelity Plan. . . . Plaintiff's allegations, if proven, will vitiate any need to demonstrate that a particular claim was submitted prior to the expiration of the contract between TPCM and Fidelity."). Thus, Plaintiffs' counsel did not so much make "a questionable decision . . . to abandon," a theory of liability on appeal, as the dissent suggests, *see post* at 79, as accept the scope of the claim that the district court certified for class treatment.

Finally, the dissent errs in suggesting that the district court's order "*precludes* recovery for those who were in the circumstance where the collapse of the Plan did not cause injury." *Id.* First, the dissent's argument seems premised on the false assumption that under the district court order the Plaintiffs' direct claims would be barred by the rule against claim-splitting. But a class action, "of course, is one of the recognized exceptions to the rule against claim-splitting." 18 *Moore's Federal Practice* § 131.40[3][e][iii] (2002) (citing Restatement (Second) of Judgments § 26(1)(c) (1982)). Second, Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims against TPCM requiring more individualized inquiry. Thus, rhetoric aside, Plaintiffs with only direct claims are not being "[j]amm[ed]," "sacrificed" or "caught" in any class action against their will. *Post* at 79.[8]

---

[8]We find somewhat disingenuous the dissent's suggestion that we have "done a disservice to an identifiable group of plaintiffs," by exposing

TPCM's final argument is that class members' asserted "interest in individual litigation of the claims" and purported possession of "large damage claims" renders their pursuit of individual actions superior to certification of a class action. This entire argument rests on one fact — that a single named plaintiff, Mary B. Gunnells, claims $70,000 in unpaid medical expenses — and one contention — that "at least 17 actions [have been] filed in South Carolina involving the sale and eventual failure of the Fidelity Plan." The district court carefully considered and acted well within its discretion in rejecting this argument.

The court found that while Ms. Gunnells claims $70,000 in unpaid medical expenses, "not all of the Plaintiffs' alleged damages are so high and the damages could run the gamut to much lower figures." J.A. 1260. Nothing in the record refutes this finding and we can take judicial notice of the fact that many health care claims will involve dollar amounts that are much lower. Moreover, we note that the size of class members' recovery is hardly determinative of superiority. *See* 5 *Moore's Federal Practice* § 23.48[2][a] (1997) (noting that when "a class action will provide the most fair and efficient adjudication of a case, such an action may be superior even though class members have sufficient means or incentive to proceed individually"). As to the seventeen already-commenced actions, the district court concluded that their existence did not make individual actions superior in a case involving over 1400 potential litigants. Again, nothing in the record in any way contradicts this common-sense finding. TPCM itself notes

them to arguments that their claims are now untimely. *Post* at 80 n.7. First, Plaintiffs with direct claims against TPCM would be equally subject to these arguments under the dissent's proposed resolution of the case. Second, while the dissent is, of course, correct that TPCM could raise a statute of limitations defense against Plaintiffs asserting direct claims, it is far from clear that TPCM would be successful. *Cf. Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983) (holding that "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action,'" and that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied" (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974))).

that it "has not been named as a Defendant in a single one of those [seventeen] actions," thus raising questions as to whether the existence of those actions is even relevant to class certification against TPCM. Accordingly, we can hardly conclude that in rendering these findings the district court abused its discretion.[9]

### C.

In sum, the district court followed the course we charted in *Central Wesleyan*. Its careful analysis of Rule 23's requirements and its detailed factual findings supporting a decision to grant conditional certification against TPCM reveal no abuse of discretion. Of course, we recognize, as the district court did, that this case may ultimately present manageability problems. Nonetheless, we cannot say at this interlocutory stage that the decision to conditionally certify a class action against TPCM constitutes an abuse of discretion, particularly in light of the special deference due trial courts on this issue. *See Central Wesleyan*, 6 F.3d at 185 ("Issues of class action manageability are properly committed to the district court's discretion, because that court 'generally has a greater familiarity and expertise' with the 'practical . . . and primarily . . . factual' problems of administering a lawsuit 'than does a court of appeals.'" (quoting *Windham*, 565 F.2d at 65)). If the district court's current assessment turns out to be inaccurate, and it becomes apparent that individual damage issues will predominate or render the case unmanageable, the court undoubtedly will recognize its responsibility to decertify the class.

---

[9]The dissent's effort to analogize this case to *Lienhart*, and to assert that we ignore "the complex question of comparative fault" arises from the same misperception regarding separate Plaintiff classes that animates the dissent's argument with respect to conflicts among Plaintiff classes. *See post* at 80, 86. Because there is only a single Plaintiff class with a single cause of action — that TPCM's mismanagement contributed to the demise of the Plan — issues of comparative fault will require no individual inquiry apart from that required to calculate damages. The extent to which TPCM's conduct contributed to the collapse of the Plan, and the comparative fault of intervening parties, such as Fidelity, will be the same for every Plaintiff. In *Lienhart*, 255 F.3d at 149, by contrast, the intervening actors and the intervening acts were different for every plaintiff, thereby creating the possibility that the defendant's degree of liability would be different with respect to every plaintiff.

We note also that in conditionally certifying the class the court specifically stated that it intended to "heed[ ] the Fourth Circuit's warning to keep a watchful vigil in a complicated case such as this one to 'make certain that manageability and other types of problems do not overwhelm the advantage of conditional certification.'" J.A. 1260 (quoting *Central Wesleyan*, 6 F.3d at 189). Indeed, the court expressly noted that "should such concerns render the class mechanism ineffective, the district court must be prepared to use its considerable discretion to decertify the class." *Id.* at 1260-61. We are confident that the court will do precisely this, if necessary.[10]

## IV.

The district court also granted, in substantial part, Plaintiffs' motion for class certification against the individual agents responsible for marketing and selling the Plan. Although the court refused to certify a class as to Plaintiffs' conspiracy and RICO claims, concluding that individual issues predominated, it did conditionally certify Plaintiffs' claims based on four other theories of liability: negligent undertaking, fraud, negligent misrepresentation, and breach of contract. The court organized its certification of these claims into subclasses — one for each of the twenty-three agents who had marketed insurance to a named plaintiff. Each subclass was permitted to pursue its four theories of liability via a separate class action.

Once again, we accord the district court's class certification decision substantial deference. Nevertheless, in this instance, we believe

---

[10]TPCM makes two ancillary arguments that we need address only briefly. First, it asserts that the district court improperly relied on affidavits of principals of the Fidelity Defendants, whom TPCM could not examine because it was not a defendant in this case when the affiants were deposed, and the New York court later stayed all proceedings against the Fidelity Defendants. This argument rests on a faulty premise, *i.e.*, that TPCM was unable to depose the affiants. In fact, we do not know whether TPCM could have deposed the affiants because it never sought to do so. Second, TPCM asserts that the district court's ruling rested on erroneous facts. Even if it could show that these factual findings were "clearly erroneous," it has utterly failed to demonstrate that any of these errors affected its substantial rights. *See* Fed. R. Civ. P. 61.

the court abused that discretion. The individual class actions certified against the Agents simply cannot satisfy Rule 23's predominance and commonality requirements.[11] This is so because Plaintiffs' claims against the individual Agents require proof of elements not necessary to their single claim against TPCM; and a number of these additional elements can only be established after considerable individual inquiry. Although the district court apparently recognized this as a general matter, it misunderstood or ignored controlling legal principles in holding that in this case such individual determinations would not be necessary and so common issues would predominate. In doing so, "the district court abuse[d] its discretion by . . . misapprehending the law with respect to underlying issues." *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989) (internal quotation marks and citations omitted).

### A.

The first reason why common issues do not predominate in Plaintiffs' claims against the Agents is the need for individual inquiry into the issue of reliance. Indisputably, negligent misrepresentation and fraud require proof of reliance. *See Robertson v. First Union Nat'l Bank*, 565 S.E.2d 309, 313-14 (S.C. Ct. App. 2002) (recounting elements of negligent misrepresentation and fraud claims under South Carolina law). To establish fraud, a plaintiff must prove, *inter alia*, that the hearer relied on the truth of a fraudulent statement, and had a right to rely thereon. *Id.* To establish negligent misrepresentation, a plaintiff must prove, *inter alia*, that the plaintiff "justifiably relied

---

[11]In addition, we note our reservations about the district court's determination as to compliance with the numerosity requirement, *see* J.A. 1265 (noting that some Agent subclasses have as few as eight class members), and the superiority requirement, *compare* J.A. 1271 (holding the South Carolina Department of Insurance's current administrative proceeding to revoke the Agents' licenses has "no bearing . . . on this proceeding") *with* 5 *Moore's Federal Practice* § 23.49[3] (1997) (noting that "if a governmental unit has brought suit on the same issue, a court may decide that the proposed class action is unnecessary and an inferior method of adjudication"). We need not address these issues, however, because *all* of Rule 23's requirements must be met. Therefore, our conclusion that the class fails to meet the commonality and predominance requirements is dispositive in this case.

on [a false] representation; and . . . the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation." *Id.* at 314. Thus, both theories of liability require that the plaintiff demonstrate (1) actual reliance *and* (2) that the plaintiff had a right to rely on the misstatement (in the case of fraud) or that such reliance was justifiable under the circumstances (in the case of negligent misrepresentation). Almost inevitably, establishing these elements requires an individualized inquiry.

As we held in *Broussard*, "the reliance element of . . . fraud and negligent misrepresentation claims [is] not readily susceptible to class-wide proof;" rather, "proof of reasonable reliance . . . depend[s] upon a fact-intensive inquiry into what information each [plaintiff] actually had." *Broussard*, 155 F.3d at 341. Nor are we alone in so holding. *See, e.g.*, *Andrews v. AT&T*, 95 F.3d 1014, 1025 (11th Cir. 1996) (decertifying class in part because "the plaintiffs would . . . have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) (concluding that "a fraud class action cannot be certified when individual reliance will be an issue").

The district court nevertheless found that the required proof of reliance in this case would not require an individual "fact-intensive inquiry" sufficient to render class certification improper, but instead found that actual reliance could be "presumed" and the right to rely "assumed." Those findings are grounded on a misunderstanding of controlling law.

1.

First, the district erred in suggesting that *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), supports a presumption of actual reliance in this case. *See* J.A. 1268 and n.27 ("[A] common sense approach presuming reliance exists may be acceptable in this circumstance.") (citing *Basic*, 485 U.S. at 246-47). In fact, neither *Basic*, nor any other precedent, supports a presumption of actual reliance in the case at hand.

*Basic* involved a shareholders' suit alleging that a company made material misrepresentations about the status of merger talks. In oppos-

ing class certification, the company argued that common issues did not predominate because each shareholder had to establish reliance on the misrepresentation in making decisions to buy or sell the stock. The Supreme Court rejected this argument, reasoning that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247. This presumption was based on the "fraud-on-the-market theory," *i.e.*, even if an individual investor was not aware of the misrepresentation (and therefore did not directly "rely" on it in the traditional sense), the market price of the stock reflected the misrepresentation, thereby providing "the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury" that is the touchstone of reliance. *Id.* at 243. In *Basic*, therefore, the capacity of the capital markets to rapidly assimilate public information into stock prices provided the basis for presuming a causal connection between a material misrepresentation and a plaintiff's injury, even when that plaintiff may have been completely unaware of the misrepresentation (let alone "relied" on it in the traditional sense). By contrast, Plaintiffs' allegations of fraud and misrepresentation offer no substitute for actual reliance to establish such a causal connection. Rather, if an individual plaintiff in this case were unaware of the alleged misrepresentations, but nevertheless purchased the Plan, we see no basis for presuming that the misrepresentations nevertheless were a proximate cause of her damages. Absent this presumption, individualized inquiry will be required to show that Plaintiffs actually relied on the Agents' alleged misrepresentations.

2.

The district court also erred in concluding that individualized inquiry would not be necessary to establish the second element of reliance — that Plaintiffs had a right to rely on the Agents' alleged misrepresentations or that reliance was justified.

The court held that "[u]nder South Carolina law, such reliance on an insurance agent is reasonable," J.A. 1268 (citing *Trotter v. State Farm Mut. Auto Ins. Co.*, 377 S.E.2d 343, 351 (S.C. Ct. App. 1988), for the proposition that it is "reasonable for [an] insured to assume the truthfulness of" an insurance agent's representations). But in fact,

South Carolina law only holds that "it is reasonable for the insured to assume the truthfulness of" his agent's representations under limited circumstances not present in this case — and, indeed, not present in *Trotter* either. *See Trotter*, 377 S.E.2d at 350-51 (concluding that reliance was not reasonable and distinguishing circumstances from those of *Giles v. Lanford & Gibson, Inc.*, 328 S.E.2d 916 (S.C. Ct. App. 1985)).

Thus, in *Giles*, South Carolina's intermediate appellate court held that when the unintelligible language of a written agreement would prevent an insured from discovering the falsity of an insurance agent's representation, it is reasonable for the insured to assume the truthfulness of the insurance agent's oral misrepresentation of the written agreement. *Giles*, 328 S.E.2d at 918-19. Because the case at hand, like *Trotter*, does not involve allegations of oral misrepresentations, or a written agreement so unintelligible that Plaintiffs could not have reasonably discovered any falsity of representation by reading the policy, the *Giles* "assumption" has no bearing here. As even the *Giles* court noted, it has long been the law in South Carolina that:

> [w]hether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, *will depend upon the various circumstances involved*, such as the form and materialty (sic) of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties.

*Id.* at 918 (quoting *Thomas v. Am. Workmen*, 14 S.E.2d 886, 888 (S.C. 1941) (emphasis added)). Thus, the district court misconstrued South Carolina law when it concluded that Plaintiffs' right to rely on the Agents' misrepresentations could be assumed without inquiring into the individual circumstances of each plaintiff's case.

Therefore, we conclude that the district court abused its discretion in finding that justifiable reliance could be assumed or presumed in this case. Absent this assumption or presumption, individual issues

clearly predominate. As the Supreme Court recognized in *Basic*, 485 U.S. at 242, "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Accord Broussard*, 155 F.3d at 341.[12]

## B.

A second reason why common issues do not predominate in Plaintiffs' claims against the Agents relates to the duty owed to Plaintiffs by the Agents. Plaintiffs' contentions of negligent undertaking are based on the Agents' alleged failure in their "duty to properly inform Plaintiffs and other members of the class about the value, quality, and extent of coverage" provided under the Plan. These contentions also require individualized inquiry.

Generally, under South Carolina law, an insurance agent does *not* have any duty to advise an insured. *See Pitts v. Jackson Nat'l Life Insur. Co.*, 574 S.E.2d 502, 510 (S.C. Ct. App. 2002) (citing *Trotter*, 377 S.E.2d at 347). A duty may be imposed, however, "if the agent, nevertheless, undertakes to advise the insured." *Carolina Prod. Maint., Inc. v. United States Fid. & Guar. Co.*, 425 S.E.2d 39, 43 (S.C. 1992) (citing *Trotter*, 377 S.E.2d at 347). Absent an express undertaking to assume such a duty (and Plaintiffs do not contend that the Agents expressly undertook such a duty here), a duty can be impliedly created. *Id.* But in determining if an implied duty has been created, courts must consider several factors, including whether: "(1) the agent received consideration beyond a mere payment of the premium, . . . (2) the insured made a clear request for advice, . . . or (3) there is a course of dealing over an extended period of time which would put an objectively reasonable insurance agent on notice that his advice is being sought and relied on." *Id.* (citing *Trotter*, 377 S.E.2d at 347). Obviously, consideration of these factors — and thus proof

---

[12]Of course, proof of individual reliance need not overwhelm the common issues in every case. However, considering the centrality of the Plaintiffs' allegations involving reliance, and the other issues requiring individual inquiry, common issues clearly do not predominate in this case.

of any implied duty — requires an inquiry into the facts of each particular case.

When certifying subclasses against the Agents, however, the district court ignored these legal principles. On appeal, Plaintiffs cannot. They must, and do, acknowledge them. They maintain, however, that the principles articulated in *Trotter* and *Carolina Production* apply only to insurance *agents* and that the defendant Agents are insurance *brokers*, who, Plaintiffs assert, "do have a special duty to their clients."

But Plaintiffs' argument — that the Agents were really "insurance brokers" — rests on a flawed premise. Under South Carolina law, an "insurance broker" represents people seeking insurance, while an "insurance agent" represents the insurance company. *See* S.C. Code §§ 38-1-20, 38-43-10 (2002); *see also Allstate Ins. Co. v. Smoak*, 182 S.E.2d 749, 753-54 (S.C. 1971) (distinguishing between insurance brokers and agents on basis of whether employed by person seeking insurance or by insurance company to solicit and write insurance). In this case, the district court specifically found that the Agents are licensed "insurance agents" who marketed and sold the Plan. Plaintiffs point to nothing in the record to support their contention that the Agents were actually "insurance brokers."[13] Accordingly, we can hardly ignore *Trotter* and *Carolina Production* and the individualized proof inquiries those cases require.

## C.

In addition to the individualized determinations inherent in Plaintiffs' claims against the Agents, the affirmative defenses of comparative negligence, assumption of risk, and set-off asserted by the Agents pose significant obstacles to class certification. Similarly, even if actual, justifiable reliance could be presumed, the Agents would still be permitted to introduce evidence to rebut this presumption with respect to individual plaintiffs. *See Banca Cremi v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 (4th Cir. 1997) (citing *Carras v.*

---

[13]Plaintiffs' broker versus agent distinction is surprising given their heavy reliance on *Trotter*, a case involving an insurance *agent*, for the argument discussed in Part IV.A.2.

*Burns*, 516 F.2d 251, 257 (4th Cir. 1975), for proposition that the inference of reliance is rebuttable). The district court again ignored the problems for class certification posed by these defenses.

On appeal, Plaintiffs maintain that "numerous courts" have rejected the notion that the assertion of affirmative defenses renders class certification inappropriate. However, they cite only *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001), in which the Second Circuit merely stated that the presence of affirmative defenses does not "automatically" render class certification inappropriate. Rather, like other considerations, affirmative defenses must be factored into the calculus of whether common issues predominate. *Id.* at 138.

Moreover, regardless of other courts' interpretations of Rule 23, we have flatly held that "when the defendants' affirmative defenses . . . may depend on facts peculiar to each plaintiff's case, class certification is erroneous." *Broussard*, 155 F.3d at 342 (citation and internal quotation marks omitted). Although it is difficult to determine with any precision, it appears that here the Agents' affirmative defenses are not without merit and would require individualized inquiry in at least some cases. Therefore, they may, indeed, "depend on facts peculiar to each plaintiff's case." Accordingly, "class certification [wa]s erroneous." *Id.* at 342.

### D.

Given the need for individual inquiry into these issues, we must hold that the class actions certified by the district court against the Agents do not meet the commonality and predominance requirements of Rule 23. Thus, the district court abused its discretion in conditionally certifying these class actions.

### V.

Finally, we turn to a contention never raised by any of the parties: our dissenting colleague's "threshold" argument, *post* at 58, that even if common issues do predominate in Plaintiffs' cause of action, as a whole, against TPCM — *i.e.*, "that TPCM violated its duties, both

contractual and at law, as third party administrator of the Plan and such conduct was a cause of the Fidelity Plan's failure," and that "failure directly injured Plaintiffs and the absent class members," J.A. 1249 — the district court erred in confining its predominance inquiry to that cause of action. The dissent steadfastly contends that the district court should instead have evaluated whether common issues predominated in the *entire* "action taken *as a whole*." *See post* at 53 (emphasis in original); *see also id.* at 54, 61 ("the case as a whole"); 57, 58, 59, 60, 61 ("the action as a whole"); and 62 ("the entire action"). According to the dissent, a district court must first "determine that" an entire law suit "as [a] whole" (i.e. not only the cause of action against TPCM but also the very different causes of action asserted against the Agents) satisfies the predominance and superiority requirements imposed by 23(b)(3) *and only if the entire lawsuit does satisfy these requirements* may a court "manage[ ] through orders authorized by 23(c)." *See id.* at 64. The dissent's argument finds no support in the law — not in Rule 23 itself nor in any case or treatise. Indeed, in addition to ignoring the plain language of Rule 23, and rendering a subsection of the rule superfluous, the dissent's argument is contrary to the Supreme Court's interpretation of Rule 23, our own precedent and that of every other court (including eight federal appellate courts), and every scholarly treatise that has addressed the issue.

First, the dissent's rigidly sequential approach ignores the plain language of the rule. Rule 23(c)(4) provides that:

> *[w]hen appropriate (A) an action may be brought or maintained as a class action with respect to particular issues*, or (B) a class may be divided into subclasses and each subclass treated as a class, *and the provisions of this rule shall then be* construed and *applied* accordingly.

Fed. R. Civ. P. 23(c)(4) (emphasis added). Thus, Rule 23 specifically dictates that "[w]hen appropriate" a class action may be "maintained" as to "particular issues" and, *after* that is done, "the provisions of this rule," such as the predominance requirement of (b)(3), "shall *then . . .* be construed and applied." *Id.* (emphasis added). The dissent's approach — that a court first determine "that the *action* as [a] whole satisfies the predominance and superiority requirements imposed by

23(b)(3)" and only then employ subsection 23(c)(4), *post* at 64, simply ignores Rule 23 (c)(4)'s express command.[14] Of course, courts have no discretion to ignore the plain language of a statute or federal rule. *See, e.g.*, *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 454 (1993) (noting that "plain meaning must be enforced, of course").

Moreover, the dissent's approach would render subsection (c)(4) of Rule 23 superfluous. The dissent would require a court considering the manageability of a class action — a requirement for predominance under Rule 23(b)(3)(D) — to pretend that subsection (c)(4) — a provision specifically included to make a class action more manageable — does not exist until after the manageability determination is made. Thus, under the dissent's reading of Rule 23, a court could only use subsection (c)(4) to manage cases that the court had already determined would be manageable *without* consideration of subsection (c)(4). This reading leaves subsection (c)(4)(A) without any practical application, thereby rendering it superfluous. *See In re Tetracycline Cases*, 107 F.R.D. 719, 726-27 (W.D. Mo. 1985) ("If the requirement under Rule 23(c)(4)(A) was that . . . one or more issues 'predominate' in the usual Rule 23(b) sense, when compared with *all* the issues in the case, there would obviously be no need or place for Rule 23(c)(4)(A)." (emphasis in original)). Such an interpretation of Rule 23 contravenes the well-established prohibition against reading a provision in a manner that would make any "clause, sentence, or word . . . superfluous, void, or insignificant," *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks and citations omitted).

---

[14]The Advisory Committee on Civil Rules has recognized subsection (c)(4)'s force despite its placement after (b)(3). Thus, in 1995 the Advisory Committee considered amending (c)(4) to read, "an action may be certified as a class action with respect to particular claims, defenses, or issues . . ." *because* "the placement in subdivision (c)(4) of the provision permitting class actions for particular issues has tended to obscure the potential benefit of resolving certain claims and defenses on a class basis while leaving other controversies for resolution in separate actions." *See* Edward H. Cooper, *Class Actions and the Rulemaking Process: Rule 23: Challenges to the Rulemaking Process*, 71 N.Y.U. L. Rev. 13, 56, 58 (1996) (quoting Proposed Amendments to Rules of Civil Procedure, Class Actions (Feb. 1995 Draft)).

In addition to ignoring Rule 23's plain language and rendering a part of it superfluous, the dissent's rigid, sequential reading of the rule conflicts with controlling precedent. The Supreme Court has refused to read Rule 23 in the strictly sequential fashion advocated by the dissent. To the contrary, in its most recent discussion of Rule 23(c)(4), *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999), the Court suggested that a district judge could *initially* act pursuant to subsection (c)(4) to create subclasses so as to satisfy the previously listed requirements of subsection (a)(4). Indeed, the *Ortiz* Court pointed out that this result "is obvious after *Amchem*," the case on which the dissent so heavily relies for its theory. *See id.* (noting that "it is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to *eliminate conflicting interests* of counsel." (citing *Amchem*, 521 U.S. at 627 (emphasis added))). Although the dissent claims otherwise, if its interpretation of Rule 23 is followed, *Ortiz* notwithstanding, a court could never use subsection (c)(4) to divide plaintiffs into homogeneous subclasses "to eliminate conflicting interests of counsel," *id.*, because plaintiffs' "entire action" "as a whole" would not satisfy the adequacy of representation requirement of Rule 23(a)(4), and would therefore never "pass through the gate[ ]" of Rule 23(a). *Post* at 58; *see also id.* at 57 (noting that an action must first satisfy "the requirements of Rule 23(a)" before a court can employ (c)(4)).[15] Despite its lengthy attempt to analogize *Amchem* to the case at hand, in an effort to find some support for its gatekeeper theory, *see post* at 59-61, the dissent fails to take into account the Supreme Court's own characterization and application of *Amchem* in *Ortiz*.

Moreover, the dissent acknowledges, but then disregards the import of the conclusion of the *Amchem* Court itself that "settlement *is relevant* to a class certification," and that Rule 23(e) affects a court's evaluation of predominance. 521 U.S. at 614 (emphasis added). The Supreme Court explained in *Amchem* that when dealing with a settlement-only class pursuant to Rule 23(e), "a district court *need not*

---

[15]Of course, *Ortiz* involves subclasses under Rule 23(c)(4)(B), while the case at hand involves certification of particular issues under (c)(4)(A), but nothing in Rule 23 suggests that (c)(4)(A) does not interact with the other subsections of Rule 23 in the same fashion as (c)(4)(B).

*inquire* whether the case, if tried, would present intractable management problems," which would ordinarily be necessary to satisfy Rule 23(b)(3)'s predominance requirement. *Id.* at 620 (emphasis added) (citing Fed. R. Civ. P. 23(b)(3)(D)). The dissent thus ignores the lesson of *Amchem* most relevant to the dissent's "threshold" contention in the case at hand, *i.e.*, the Supreme Court's recognition that the subsections of Rule 23 are *interactive*, and not to be followed, as the dissent suggests, in a strictly *sequential* fashion. In sum, in its two most recent class action decisions, *Ortiz* and *Amchem*, the Supreme Court eschewed the dissent's suggested approach of reading each of Rule 23's provisions sequentially.

Additionally, precedent from our own court flatly rejects the dissent's sequential interpretation of Rule 23. In *In re A.H. Robins*, 880 F.2d at 740, we counseled that "courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." We expressly recognized that *"if [an] action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims* from other claims in the action *and certify them* under the provisions of subsection (c)(4)," provided that "each subclass must independently meet all the requirements of (a) and at least one of the categories specified in (b)." *Id.* at 728 (emphasis added). Thus, contrary to the dissent's protests in this case, we do not espouse a new rule. Rather we follow the rule articulated in *A.H. Robins* — that subsection 23(c)(4) should be used to separate "one or more" claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met.

Nor are we alone. Not a single court has followed the dissent's approach. Several courts and a number of distinguished commentators have *explicitly* endorsed a broad *issue*-specific predominance analysis of Rule 23. *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." (citations omitted)); *Simon v. Phillip Morris, Inc.*, 200 F.R.D. 21, 28-31

(E.D.N.Y. 2001) (Weinstein, J.) ("The framers of Rule 23(c)(4)(A) considered class actions brought under Rule 23(b)(3) . . . particularly well suited for certification of fewer than all issues. Their conclusion follows from the fact that Rule 23(c)(4)(A) assists in satisfying Rule 23(b)(3)'s additional class certification requirements of predominance and superiority." (citations omitted)); *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 395 (D. Kan. 1998) (explaining that Rule 23(c)(4)(A) permits "adjudication of any issues common to the class even though the entire litigation may not satisfy the requirements of Rule 23"); 6 *Newberg on Class Actions* § 18:7 ("Even cases which might not satisfy the predominance test when the case is viewed as a whole may sometimes be certified as a class limited to selected issues that are common, under the authority of Rule 23(c)(4)."); 7B Wright & Miller, *Federal Practice and Procedure* § 1790 ("Subdivision (c)(4) is particularly helpful in enabling courts to restructure complex cases to meet the other requirements for maintaining a class action. . . . The theory of Rule 23(c)(4)(A) is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member.").

All other courts have explicitly or implicitly endorsed an interpretation of (c)(4) that considers whether Rule 23's predominance requirement is met by examining *each cause of action* independently of one another, not the entire lawsuit, as the dissent would. *See, e.g.*, *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38-43 (1st Cir. 2003) (reversing decertification of two out of three decertified claims and affirming decertification with respect to third claim); *Piazza v. EBSCO Industries, Inc.*, 273 F.3d 1341, 1349, 1351-53 (11th Cir. 2001) (finding "no basis for concluding that the district court abused its discretion by certifying a class against the EBSCO Defendants on" claim for breach of fiduciary duty for lost profits but finding abuse of discretion for certification of stock sale and undervaluation claims against EBSCO and reversing class certification with respect to claims against another defendant, Price Waterhouse Cooper); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 154 (2d Cir. 2001) (evaluating plaintiffs' disparate impact claim separately from pattern-or-practice disparate treatment claim); *Becherer v. Merrill Lynch*, 193 F.3d 415, 430 (6th Cir. 1999) (*en banc*) (Moore, J., concurring in the judgment) (noting that district court "properly

certified a class with respect to the contract claims" against one defendant, without ruling on fraud and other claims against multiple defendants); *id.* at 428 (majority opinion) (noting without disapproval that "the district court reached the class certification question with respect to the contract issues, but not the remaining claims"); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421-22 (5th Cir. 1998) (conducting an *independent* predominance inquiry for each cause of action); *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544 (D.N.J. 1999) ("This court . . . has previously rejected the notion that class certification under Rule 23 is 'an all-or-nothing proposition' requiring class certification of all causes of action asserted in a single pleading." (citations omitted)); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 289 & n.4, 295 (D.N.J. 1997) (granting class certification for antitrust claims, denying certification for claims of statutory and common law fraud, breach of duty of good faith and fair dealing, unjust enrichment, and money had and received, and noting that "[d]ifferential treatment of claims is permitted by Rule 23(c)(4)" and that no cases suggest "that class certification of all asserted causes of action is an all-or-nothing proposition"); *Hudson v. Capital Mgmt. Int'l, Inc.*, 565 F. Supp. 615, 630-31 (N.D. Cal. 1983) (granting class certification for statutory claims of fraud and negligent misrepresentation and denying certification for common law claims despite recognizing that "[i]ndividual questions of law and fact would vastly overshadow any common questions if the court were to certify classes based on the common law claims"); *Lewis v. Capital Mortgage Invs.*, 78 F.R.D. 295, 307 (D. Md. 1978) (granting class certification for securities law claims but excluding common law fraud claim from class action certification); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558, 561 (S.D. Fl. 1973) (granting class certification for negligent exposure cause of action but not breach of contract, breach of implied warranty, or inadequate medical treatment causes of action); *see also* Hannah Stott-Bumsted, Note, *Severance Packages: Judicial Use of Federal Rule of Civil Procedure 23(c)(4)(A)*, 91 Geo. L.J. 219, 231 (2002) (observing that "there is little dispute" that certification of a single claim in a suit where plaintiffs assert multiple claims "is an acceptable use of the district court's discretion under Rule 23(c)(4)(A).")

Indeed, the Third Circuit has twice reversed district courts for taking the dissent's approach and failing to consider class certification of individual claims. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434,

453 (3d Cir. 1977) ("Even assuming that the court were correct in its conclusion that the lease claim is not appropriate for class determination, it nevertheless should have considered certification of the trademark claim under Rule 23(c)(4)(A)."); *Geraghty v. United States Parole Comm'n*, 579 F.2d 238, 252-53 (3d Cir. 1978) (rejecting district court's conclusion "that a class action is inappropriate" because "not all of the grounds of action alleged in the complaint are applicable to the [proposed] class" because that conclusion "does not properly acknowledge the powers and duties of the trial court under section (c)(4) of Rule 23"), *vacated on other grounds*, 445 U.S. 388, 402-03 (1980).

Again, *no* court has adopted the dissent's interpretation of Rule 23; no court has required a *lawsuit*-specific predominance analysis. Thus, the dissent's attacks on our approach are as baffling as they are ill-founded. The dissent's contention that our approach "bypasse[s]" and "subvert[s]" Rule 23(b)(3)'s predominance requirement, and "strips Rule 23(b)(3) of its meaning," *post* at 56, 59 and 61, is simply false. We have scrupulously analyzed whether Plaintiffs' claims against TPCM and the Agents satisfy the predominance requirement. *See ante* at 13-14, 17-20, 27-33. After doing so, we have concluded that Plaintiffs' cause of action against TPCM — "that TPCM violated its duties . . . as third party administrator of the Plan," which caused "the Plan's failure" and so "directly injured Plaintiffs" J.A. 1249 — taken as a whole, satisfies all of Rule 23's requirements, including predominance, *ante* at 13-14, 17-20.[16] That the dissent reaches a different conclusion as to whether common issues predominate with respect to Plaintiffs' claim against TPCM does not mean that we "strip[ ] Rule 23(b)(3) of its meaning;" it just means that the dissent disagrees with our assessment. Indeed, the continuing vitality of Rule 23(b)(3)'s predominance requirement dictated our reversal with respect to Plaintiffs' claims against the Agents — a decision *with which the dissent concurs*.

---

[16]Thus, contrary to the dissent's contention, *post* at 60, there is no reason to "wonder exactly what" the common issues in the certified cause of action against TPCM "predominate over;" they predominate over the individual issues involved *in that cause of action*.

The dissent offers an equally perplexing response to the wealth of authority cited above, including cases from the First, Second, Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits, all of which have rejected the dissent's contention that a class can be certified only if the common issues in "the entire action" — *i.e.*, every cause of action against every defendant — predominate over individual issues in "the entire action." The dissent does not discuss, let alone distinguish, most of the cases we cite; it simply maintains that they do not exist. *See post* at 63 (dissent noting it can "identify" no circuit precedent supporting the majority's holding).[17]

---

[17]Pointing to the various theories of liability alleged in Plaintiffs' complaint against twenty-three agents and TPCM, the dissent surprisingly asserts that each of these theories constitutes *a cause of action* and that the certified claim against TPCM is simply a "common question." *See post* at 62. Even if this were so, it is unclear how this contention aids the dissent — for the predominance inquiry would still be conducted within the confines of these "causes of action" not the lawsuit as whole, as the dissent would. *See, e.g.*, *Allison*, 151 F.3d at 421-22. In fact, the dissent's contention is a red herring. A cause of action is "defined by its factual contours" and is "'coterminous with the transaction regardless of the number of substantive theories . . . that may be available to the plaintiff.'" *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 194, 200 (3d Cir. 1999) (quoting Restatement (Second) of Judgments § 24 cmt. a). Thus "claims are part of the same cause of action when they arise out of the same transaction . . . or the same core of operative facts." *Grausz v. Englander*, 321 F.3d 467, 473 (4th Cir. 2003) (internal quotation marks omitted). Certainly, in some cases, each theory of liability arises from a different set of operative facts and so constitutes part of a different cause of action. But here, although Plaintiffs assert several theories of liability against TPCM, all of these theories arise from a single set of "operative facts" and so are part of a single cause of action — that TPCM mismanaged administration of the Plan resulting in the Plan's failure to timely pay out benefits. Moreover, Plaintiffs assert different causes of action, arising from a very different set of "operative facts," against the Agents — that the Agents misrepresented the Plan's features leading the Plaintiffs to purchase a woefully deficient Plan. Notably, neither TPCM nor any other defendant challenges the district court's clearly proper treatment of Plaintiffs' claim against TPCM as a single cause of action separate and independent from their claims against the agents.

Just as confounding, is the dissent's contention that the Fifth Circuit has adopted the dissent's approach and that we, in assertedly refusing to follow the Fifth Circuit, create a circuit conflict. *See post* at 53-54, 62-63 (citing *Smith v. Texaco, Inc.*, 263 F.3d 394 (5th Cir. 2001), *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), and *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)). In fact, the Fifth Circuit cases do not state, let alone hold, as the dissent would, that "the entire action," or "the action as a whole" — *i.e.*, all causes of action against all parties — must satisfy Rule 23 (b)(3)'s predominance requirement before a court can employ Rule 23(c)(4) to certify a class. Rather, the Fifth Circuit cases merely require that "*a cause of action, as a whole,* must satisfy rule 23(b)(3)'s predominance requirement" before "rule 23(c)(4) is available." *See Smith*, 263 F.3d at 409 (emphasis added); *Allison*, 151 F.3d at 421-22; *Castano*, 84 F.3d at 745 n.21.[18] To be sure, as the Second Circuit has noted,

---

[18]The dissent fundamentally errs in suggesting that we engage in some sort of "wordsmithery" in noting this important distinction between the Fifth Circuit's view and the dissent's approach. *See post* at 63. In fact, the Fifth Circuit itself has made plain that it means exactly what it has said — a court is to determine that predominance is satisfied when assessing each "cause of action, as a whole," *not* the entire lawsuit, as a whole, as the dissent posits. For example, in *Allison*, 151 F.3d at 407, 409, African-American plaintiffs charged employment discrimination and sought class certification of two causes of action: (1) a claim of systemic disparate treatment by their employer resulting in a pattern or practice of intentional discrimination and (2) a claim of disparate impact arising from a facially neutral employment policy. The Fifth Circuit analyzed each of these claims *separately* in determining whether (b)(3)'s predominance requirement had been met. *Id.* at 420-25. In looking at the *first cause of action* — the disparate treatment/pattern or practice claim — the court held that the "first stage of the pattern or practice claim" could not be divorced from its "second stage" for the predominance analysis. *Id.* at 421-22. Instead, the court conducted the predominance inquiry by looking at the pattern or practice claim *as a whole*, and found that common issues did not predominate with respect to *that cause of action*. *Id.* Although the different parts of the disparate treatment/pattern or practice *cause of action* could not be "severed," the court conducted a completely independent predominance analysis for the *second cause of action* — the disparate impact claim — to assess, as it said, "the possibility of certifying a class action *only on the disparate impact claim*." *Id.* at 422 (emphasis added). This is precisely the approach we have followed; it is the majority, not the dissent, that the Fifth Circuit precedent supports.

there is a circuit conflict as to whether predominance must be shown with respect to an entire cause of action, or merely with respect to a specific issue, in order to invoke (c)(4). *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167 n.12 (2d Cir. 2001) (noting the Fifth Circuit's "strict application of the (b)(3) predominance inquiry to the entire pattern or practice claim" before a court can invoke (c)(4) and further noting that "an alternative understanding of the interaction of (b)(3) and (c)(4) . . . has been advanced elsewhere" including by the Ninth Circuit in *Valentino*, 97 F.3d at 1234. But we have no need to enter that fray (and similarly the dissent's ruminations about "pinhole" issue certification have no relevance here) because, as we have demonstrated within, in this case Plaintiffs' *cause of action* as a whole against TPCM satisfies the predominance requirements of Rule 23. Thus even if the view adopted by the Fifth Circuit (that predominance must be established within a given cause of action to invoke (c)(4)) rather than that of the Ninth Circuit (that this is not necessarily required) constituted the law of this circuit, our holding here would be in full accordance with the Fifth Circuit view.

In fact, we are aware of no decision by any court that has adopted the dissent's view that in cases such as the one before us, involving more than one cause of action, a court must evaluate predominance in the context of the "action taken as a whole" or the "case as a whole." *Post* at 53 and 54. On the contrary, as discussed above, it is the dissent's approach that would create a direct conflict with all other courts, and abrogate longstanding precedent and practice in the area of class action law. *See ante* at 35-40.

Finally, the dissent errs in predicting a "procedural nightmare" on remand. *See post* at 56. The class action certified by the district court against TPCM involves a single, straightforward cause of action consisting of three questions common to all Plaintiffs — whether "TPCM violated its duties . . . as third party administrator of the Plan," whether "such conduct was a cause of the Fidelity Plan's failure," and whether "that failure directly injured Plaintiffs and the absent class members." J.A. 1249. Neither of the first two questions require any individual inquiry, and the third question may require nothing more than a ministerial determination that can be made simply and quickly. We are confident at this stage that proceeding with this cause of action on a class-wide basis will "'achieve economies of time, effort,

and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *See Amchem*, 521 U.S. at 615 (citation omitted).[19] Moreover, it is important to remember that we are only approving a *conditional* certification of the case, and that the district court has explicitly stated that it would not hesitate to decertify the class if it became unmanageable. J.A. 1260-61. Thus, in the unlikely event that the case becomes a "procedural morass," as the dissent predicts, *post* at 56, we are confident that the district court will fulfill its responsibility to decertify the class.

## VI.

In conclusion, we note that circuit precedent provided clear guidance in resolving the issues presented in this case. On one hand, Plaintiffs' class action against TPCM bears many similarities to the class action we approved in *Central Wesleyan*, and promises many of the advantages: the plaintiffs advance a single theory of liability, requiring no individualized inquiry; class certification seems likely to conserve judicial resources and conserve litigation costs by reducing the need to re-litigate liability issues in multiple trials; in the absence of class certification it appears that many of Plaintiffs' claims against TPCM would not be brought; and class certification protects *the defendant*, TPCM, from inconsistent adjudications and one-way issue preclusion. Moreover, as in *Central Wesleyan*, the district court care-

---

[19]While the dissent bemoans the need for 1,400 separate individual full trials on the non-certified claims, its approach would, in fact, *add* claims — all of the claims against TPCM — to what it describes as a "minefield for legal error." *Post* at 82. Denying class certification against TPCM would require Plaintiffs to prove the same elements of the certified cause of action against TPCM in 1,400 individual trials, with the possibility of contradictory findings and one-way issue preclusion. In contrast, by holding that the district court did not abuse its discretion in conditionally certifying the one cause of action against TPCM, we have faithfully adhered to the text and purpose of Rule 23 and chosen a course that will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *See* Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (b)(3)). In doing so, we believe we have removed from the dissent's "minefield" those mines that could properly be removed.

fully assessed all of Rule 23's requirements for a class action and issued detailed factual findings explaining its decision in conditionally certifying the class. Indeed, to the extent there are significant differences between the class action certified against TPCM and the class action certification approved in *Central Wesleyan* — such as the need in *Central Wesleyan* to determine comparative fault, and the application of the laws of different jurisdictions — these differences weigh even more heavily in favor of class certification here. In sum, *Central Wesleyan* virtually compels the conclusion that the district court did not abuse its discretion in conditionally certifying Plaintiffs' class against TPCM.

On the other hand, Plaintiffs' proposed class actions against the Agents have many parallels to the class action we rejected in *Broussard*: the claims against the Agents require individualized proof of reliance and individualized proof of a specific undertaking to advise. The Agents' affirmative defenses would also require further individualized inquiry. Thus, *Broussard* would seem to require the conclusion that common issues do not predominate, and that class certification is not appropriate. Indeed, the district court recognized *Broussard*'s force and therefore attempted mightily to distinguish the case. The court could do so, however, only by misconstruing or ignoring controlling legal principles. When a court misapprehends or fails to apply the law with respect to underlying issues, it abuses its discretion. Accordingly, we hold that the district court abused its discretion in granting conditional class certification against the Agents.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED FOR FURTHER PROCEEDINGS*

**Volume 2 of 2**

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in that part of the judgment holding that the district court abused its discretion in certifying individual "subclasses" against the Agent defendants. I dissent from the remainder. I would hold that the district court abused its discretion in certifying a single class for claims against TPCM because the representative parties have not satisfied the requirements of Federal Rules of Civil Procedure 23(a)(3), 23(a)(4), and 23(b)(3).

The majority opinion in this case is able to approve a partial class-action certification only by failing to account for the full range of the plaintiffs' claims and the extent to which most of their claims must concededly be adjudicated on an individual basis, ignoring the erosive effect that the individual adjudications of these additional claims has on the predominance requirement of Rule 23(b)(3) that common issues predominate over the individualized questions raised in the action taken *as a whole*. For example, the majority never addresses the practical and legal difficulties that will arise from the certification of a class action against TPCM with respect to only one or two issues while leaving for individual adjudication in 1,400 separate individual trials the issues of damages and, in some cases, causation, as well as:

1) all claims under the South Carolina Unfair Trade Practices Act;

2) all claims alleging civil conspiracy;

3) all claims involving violations of RICO;

4) all issues that qualify each plaintiff for a claim under the applicable Plan; and

5)    all claims against the agents who sold the Plan.

The need for these individualized separate trials is conceded.

Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) — a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) — with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," *see* Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

*Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996); *see also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421-22 (5th Cir. 1998).

In addition, the majority opinion attempts to shoehorn this case, even with its limited focus on a single issue, into the parameters of

our distinguishable holding in *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993), in which we affirmed the conditional certification of a class of asbestos litigants. In doing this, the majority fails to consider the broad complexities raised by the unaddressed issues in this litigation and fails to apply the later and more specifically applicable controlling ruling of the Supreme Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

Finally, the majority fails meaningfully to address overt conflicts of interest existing among members of the conditionally certified class. For example, it does not attempt to explain how the conditionally certified class may include, on the one hand, employers seeking *rescission* of the insurance contract and the return of premiums paid, and, on the other hand, their employees seeking *enforcement* of the same insurance contract to obtain benefits under it. The majority also discounts, on scant deposition testimony, the potentiality that aggrieved employee-class members who were damaged by nonpayment or delayed payment of claims may implead as defendants their employers, who are also class members and who made the decision to purchase the woefully inadequate plan. Even aside from the antagonistic posture of the employer and employee class members, the injured employees' claims themselves will have to be aggregated into antagonistic subclasses, based on when their claims were mismanaged and by whom, with entitlement to relief premised on different theories. By lumping all of these employees into one class and apparently casting aside as informally "disavowed" a group of employees' best theory of recovery, the majority deindividualizes inherently individual claims and lops off substantial limbs from the various class members' claims in order to bless the conglomeration of a similar, albeit now disabled, class of litigants.

Had these problems been addressed by the majority opinion and the distinguishable aspects of *Central Wesleyan*, as well as the controlling analysis of *Amchem*, been explored, it would have become apparent that plaintiffs cannot satisfy, under any applicable precedent, the requirements of Federal Rule of Civil Procedure 23 (1) that their claims *be typical* of the claims of the class so that they can act *as representative parties*, able fairly and adequately to protect the interests of the class, as required by Rule 23(a)(3) and (4); (2) that common questions of law and fact *predominate* over questions affecting only

individual class members, as required by Rule 23(b)(3); and (3) that the class action be *superior* to other available methods for the fair and efficient adjudication of the numerous claims and controversies, as required by 23(b)(3).

As a result of the majority's limited focus on the facts related to a single issue in this case, it has left a difficult and complex procedural structure created by the need to try numerous individual claims for each class member that will result in an unnecessary, and ultimately unhelpful, procedural nightmare. And on a broad judgment level, one has to question the utility of enduring this procedural morass for the purpose of answering the single question certified for class treatment: whether TPCM's mismanagement was *a* cause of the Plan's failure. Answering this question resolves no class member's claim and only invites the difficult questions of how to proceed once the question is answered. Little, if any, time or effort can be saved by answering this question in the abstract because full individual trials on liability will still have to be conducted for each individual class member.

I would reverse the certification of the class against TPCM in this case for the reasons that follow.

I

Because the majority holds that the district court's conditional certification of a single issue against TPCM constituted a proper application of Rule 23(c)(4), *ante* at 14-15, it is necessary to address at the outset the fundamental issue of why the predominance requirement of Rule 23(b)(3) cannot be bypassed by reliance on Rule 23(c)(4). In short, I believe that the majority, in adopting an expansive interpretation of Rule 23(c)(4), has enlarged the reach of Rule 23 in a manner not contemplated by the Rule's drafters and not consistent with the Supreme Court's approach calling for an "undiluted" application of Rule 23(b)(3)'s requirements in every case. *Amchem*, 521 U.S. at 620; *see id.* (noting that the Rule, as written, "sets the requirements [courts] are bound to enforce" and counseling against "judicial inventiveness" in application of the Rule). Thus, I would conclude that the history of the Rule and its text, read in light of the Supreme Court's holding in *Amchem*, require that even in cases involving the certifica-

tion of issue-only classes, the common issues must predominate over questions affecting only individual members of the class in the context of the action as a whole. The majority's conclusion to the contrary seems to invite an unhesitating approach to granting class certification where other procedural devices would suffice, and in doing so, it opens a conflict with the Fifth Circuit. Thus, only after I elaborate the basis of my conclusion that a predominance analysis is mandated in every Rule 23(b)(3) class action do I then proceed with the required analysis by looking at the various issues and claims presented in this case.

Of the Rule 23 amendments adopted in 1966, the addition of Rule 23(b)(3) was "the most adventuresome innovation." *Amchem*, 521 U.S. at 614 (internal quotation marks and citation omitted). Because Rule 23(b)(3) was an innovative device and indeed involved some speculation about its impact, the Rule was careful to impose two specific and important requirements that must be found as conditions to certification of any class under the Rule. The "predominance" requirement requires the district court to evaluate the "action" to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and the "superiority" requirement requires the court to analyze whether the proposed class action would be "superior to other available methods for the fair and efficient adjudication of the controversy" raised by the "action." Fed. R. Civ. P. 23(b)(3). If an action does not satisfy those two "class-qualifying criteria" in addition to the requirements of Rule 23(a), *Amchem*, 521 U.S. at 621, there is no basis for the court to certify a proposed class, even on a conditional basis. The predominance and superiority requirements are thus organic to every 23(b)(3) action. In *Amchem*, where the plaintiffs sought to bypass the predominance requirement in certifying a class for settlement, the Supreme Court could not have made that proposition any clearer:

> In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3).

\* \* \*

> To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."

*Id.* at 614-15. Indeed, the Court emphasized that Rule 23(b)(3)'s requirements are "class-qualifying criteria" and that "[f]ederal courts . . . lack authority to substitute for Rule 23's certification criteria" any other standard than the one adopted in the rule itself. *Id.* at 621-22.

Even though every class action must pass through the gates of Rule 23(b)(3), a court is, of course, entitled to take into account the manageability tools supplied by Rule 23(c)(4) in determining whether the predominance and superiority requirements of Rule 23(b)(3) are satisfied with regard to the action as a whole. Thus, just as a court may consider the availability of subclasses in determining whether an action satisfies Rules 23(a) and 23(b)(3), *see Ortiz v. Fireboard Corp.*, 527 U.S. 815, 856 (1999)(noting that, at the class certification stage, the availability of subclasses to eliminate conflicting interests could factor into whether the requirement of Rule 23(a)(4) is satisfied), so may it consider the availability of issue-only classes in making the same determinations. In either case, for such subclasses or issue-only classes to be useful management tools in a particular case, they, too, must individually satisfy the requirements of Rule 23(a) and 23(b)(3). *See* Fed. R. Civ. P. 23(c)(4) (providing that, if a court utilizes issue-only classes or subclasses, "the provisions of this rule shall then be construed and applied accordingly"). In the case before us, however, the threshold dispute I have with the majority is not whether the single-issue class that has been certified here satisfies Rule 23(b)(3),[1] but rather whether an issue-only class action may be maintained under Rule 23(c)(4) when the common issue does not predominate over the other issues in the litigation that affect only individual members.

I conclude that when the text of Rule 23(b)(3) provides that "questions of law or fact common to the members of the class [must] pre-

---

[1]For reasons that I explain *infra*, I would hold that the class certified does not even satisfy the requirements of Rule 23(a) and 23(b)(3).

dominate over any questions affecting only individual members" in "[a]n action," "action" means the *action as a whole*. And I do not believe that the possibility of bringing or maintaining an action "with respect to particular issues" was ever meant to expand Rule 23(b)(3) to allow class certification when the individual issues in the class members' case against a defendant tower over the comparably insignificant common issue or issues. The majority disagrees with my reading, which it disparages as "rigidly sequential," *ante* at 34, instead adhering to a reading of Rule 23(c)(4) that allows a district court to certify any common issue in the litigation, no matter how small. In my view, the majority's interpretation of Rule 23(c)(4) invites a diluted application of Rule 23(b)(3) in the context of issue-only classes, which I respectfully submit departs from the principle elaborated in *Amchem*.

The core question addressed by the Supreme Court in *Amchem* was the interplay between Rule 23(b)(3) and 23(e), the provisions upon which the parties sought certification of a settlement-only class and, ultimately, approval of the negotiated settlement. The settling parties viewed the predominance requirement as a requirement applicable only to an action that was destined for *trial*, and therefore they argued that cohesion of the action and fairness for settlement was better determined by a hearing under Rule 23(e) when approving settlement. Because the Supreme Court in *Amchem* analyzed the relationship between the predominance requirement of Rule 23(b)(3) and the settlement authority of Rule 23(e), its analysis is apposite to the analysis of whether the predominance requirement of Rule 23(b)(3) can be subverted by Rule 23(c)(4)(A).

The district court in *Amchem* certified the settlement-only class over objectors' strenuous objections that the Rule 23(b)(3) class did not meet the requirements of Rule 23(a) and (b)(3). The Third Circuit vacated the class certification, holding that the settlement-only class satisfied neither Rule 23(a) nor 23(b)(3) and that the cases should proceed either through consolidation under Rule 42(a) or as smaller class actions under Rule 23. 521 U.S. at 611. Affirming the Third Circuit, the Supreme Court "emphasize[d]" that the requirements of Rule 23(a) and (b)(3) are "safeguards," not "impractical impediments" that can be disregarded by a court that perceives a measure of fairness in overlooking these standards in a particular case. *Id.* at 621. While

holding that settlement was "relevant" to class certification and acknowledging that the manageability of a trial was not relevant to a class action where no trial was contemplated, the court noted that the other specifications of the Rule, including the predominance requirement, "demand[ed] undiluted, even heightened attention." *Id.* at 620. Requiring a settlement-only class to satisfy Rule 23(b)(3)'s requirements, the Court held, "serve[s] to inhibit appraisals of the chancellor's foot kind — class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness." *Id.* Importantly, the Court concluded that "it is not the mission of Rule 23(e) to assure the class cohesion that legitimizes representation action in the first place." *Id.* at 623. "If a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3)," the Court continued, "that vital prescription would be stripped of any meaning in the settlement context." *Id.*

Just as it is not the mission of Rule 23(e) to supply the cohesion that legitimizes a settlement-only class action, neither is it the mission of Rule 23(c)(4)(A) to supply the cohesion to legitimize an issue-only class action. In both situations, the cohesion essential to legitimize a 23(b)(3) class action can be shown only when the action as a whole satisfies the predominance requirement of Rule 23(b)(3). The principle of *Amchem* is that every Rule 23(b)(3) class action must satisfy all of the provisions of Rule 23(a) and (b)(3), and the other provisions of the Rule, including Rule 23(e), cannot be used to dilute the requirement that each proposed class must satisfy the predominance requirement to merit certification. In my view, the majority's reading of Rule 23(c)(4) allows for a diluted application of Rule 23(b)(3) by removing from the predominance calculus most of the individualized issues in the case.

Under the majority's analysis, which looks at the common issue in the case through a pinhole and ignores all other issues, Rule 23(b)(3)'s vital prescription is stripped of any meaning in an even more dramatic way than it was in *Amchem*. The majority in this case boldly holds that individualized claims and issues in this action are not a factor in analyzing whether common issues predominate in the *certified* claim against TPCM, leaving one to wonder exactly *what the isolated common issue must predominate over*. For if Rule 23(c)(4)(A) allows a court to omit from its predominance analysis any

claims or issues affecting only individual members, it would seem that the predominance of the selected issue is a foregone conclusion since the common question of law or fact would always predominate over the individual issues that are not a factor. And in the rare instance where the majority might find a common issue not to predominate in a given case, it could simply narrow the pinhole until, in its view, the selected issue predominates over the other issues it chooses to see. Indeed, nothing in the majority's opinion supplies any lower limit on just how narrow a common issue may be before its analysis must yield to common sense. By adopting a view of Rule 23(c)(4)(A) that strips Rule 23(b)(3) of its meaning, necessitating the aid of additional principles found nowhere in the Rule itself, the majority has "substitute[d] for Rule 23's certification criteria a standard never adopted," a substitution that "[f]ederal courts . . . lack authority" to make. *Amchem*, 521 U.S. at 622.

In an effort to enlist legal authority to interpret Rule 23 to authorize a class action on a single issue, the majority, in Part V, misconstrues how I have interpreted Rule 23 and fails to appreciate the consequences of reading the Rule in a manner that lets Rule 23(c)(4) serve as a gate house for determining whether a class action should be certified. Even as an action may include different "causes of action" or different theories of recovery, all causes of action or claims must be related to form the action. *See* Fed. R. Civ. P. 18-21, 42. And Rule 23 provides that, to qualify "an action" as a class action, the prerequisites of both subdivision (a) and subdivision (b) be satisfied. *See* Fed. R. Civ. P. 23(b). Subdivision (c) then addresses the management of the class action authorizing the certification of either issues or subclasses. But a class certification with respect to an issue cannot, without bypassing Rule 23(b), be undertaken unless the issue is so important to disposition of "the action" that it "predominates over any questions affecting only individual members." Rule 23(b)(3). None of the cases cited by the majority advocate such a bypassing that the majority now advances as an entirely novel proposition.

The majority criticizes my demand that a full predominance analysis be conducted, as required by Rule 23 and *Amchem*, both insisting that it can rely on a single issue to certify the class — notwithstanding a conclusion that the predominance test would *not* be satisfied in the context of the action as a whole — and stating that I have "ignore[d]

the plain language of [Rule 23(c)(4)]," *ante* at 34, and that my analysis "render[s] a subsection of the rule superfluous," *ante* at 35.

I disagree. This very case illustrates the importance of my conceptual disagreement with the majority and the inviability of the majority's position. In this case, the class members have asserted *seven* causes of action against TPCM: an unfair trade practices claim, a negligent undertaking claim, a fraud claim, a negligent misrepresentation claim, a breach of contract claim, a civil conspiracy claim, and a RICO claim. The majority, *without identifying to which of these seven causes of action the certified issue belongs*, has certified for class treatment the vague question whether TPCM was "a cause" of the failure of the Plan. Naming this certified question a "cause of action," but not tying it to any specific claim in the complaint, the majority makes the analysis of what this common question must predominate over particularly abstruse. The majority's analysis seemingly identifies a common causation issue and then jumps immediately to Rule 23(c)(4)(A) to insulate the newly certified issue-only class from the scrutiny of the predominance requirement in the context of the case as a whole, even as the plaintiffs urged consideration of the entire action and certification of the action as a whole. *See* Pls.' Mot. for Class Certification at 4 (seeking certification of a single class for all seven causes of action against TPCM and certain other defendants).

In failing to examine the various other issues presented in the entire action to determine whether the required "cohesiveness" is present to "legitimize[ ] representative action in the first place" — as mandated by 23(b)(3), *see Amchem*, 521 U.S. at 623 — and by jumping to 23(c)(4), the majority not only bypasses one of the most essential and most important checks imposed by Rule 23 on certifying Rule 23(b)(3) classes, it also opens a conflict among the circuits on this issue. The Fifth Circuit has applied the Rule with the dogged requirement of satisfying predominance before considering other aspects of the Rule in a 23(b)(3) class. *See Smith v. Texaco, Inc.*, 263 F.3d 394, 409 (5th Cir. 2001) (later withdrawn pursuant to settlement by the parties, *see* 281 F.3d 477 (5th Cir. 2002)); *Allison*, 151 F.3d at 421-22; *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996). In *Smith*, the court explained its position on the proper relationship between the predominance requirement and Rule 23(c)(4):

> The predominance inquiry involves a comparison of the issues common among the class members and the issues individual to them. This analysis remains unchanged whether a class is certified under one or more sections of rule 23(b). The inquiry's constancy serves as an important limitation on the use of bifurcation by preventing a district court from manufacturing predominance through the "nimble use" of Rule 23(c)(4). *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).

> Therefore, the cause of action, as a whole, must satisfy rule 23(b)(3)'s predominance requirement. *Id.* Once that requirement is met, rule 23(c)(4) is available to sever the common issues for a class trial. To read the rule not as a housekeeping rule, but instead as allowing a court to pare issues repeatedly until predomination is achieved, would obliterate rule 23(b)(3)'s predominance requirement, resulting in automatic certification in every case in which any common issue exists, a result drafters of the rule could not have intended.

263 F.3d at 409; *see also Allison*, 151 F.3d at 421-22. *Cf. Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing a district court's effort to rely on 23(c)(4) and bypass 23(b)(3) but acknowledging that in "appropriate cases" the predominance requirement could be overlooked). We can identify no precedent from the Supreme Court or from our fellow Circuits to support the majority's holding.

The majority's breathtaking assertion that its reading of Rule 23(c)(4) does not in any way contravene the Fifth Circuit's cases is simply not true. The Fifth Circuit, by its very language, only consults the "housekeeping" provisions of Rule 23(c)(4) "once [the predominance] requirement is met." *Smith*, 263 F.3d at 409. This is exactly the "rigidly sequential approach" that the majority criticizes in its opinion, *ante* at 34, making its claim to consistency with the Fifth Circuit facetious, at best. The majority's wordsmithery with respect to the term "cause of action" does not disguise a plain conflict between the Fifth Circuit's holding and its holding. To be sure, the majority identifies some district court opinions, commentaries, and a student note that, citing one another, argue in favor of the majority's interpre-

tation. But I respectfully disagree with the cited authorities, and in doing so, I adhere to the view of the only other circuit court to address the issue.

I would hold therefore that under the proper analysis, the district court must determine that the *action* as whole satisfies the predominance and superiority requirements imposed by 23(b)(3), and actions satisfying these requirements may be managed through orders authorized by 23(c). Thus, under Rule 23(c)(4), a court could create subclasses or even bifurcate claims by issues, grouping them for class action treatment. But in this complicated case, the predominance and superiority requirements cannot be satisfied even with the aid of the manageability tools supplied by Rule 23(c), as I now proceed to demonstrate in some detail.

## II

The plaintiffs in this case are purchasers and beneficiaries of a multi-employer healthcare plan (the "Plan") sponsored and marketed in South Carolina by the Fidelity Group, Inc. On the Plan's demise, they commenced this class action under Federal Rule of Civil Procedure 23(b)(3) against the Fidelity Group and related companies and individuals, against 43 agents who marketed and sold the Plan, and against the Plan's first claims administrator, alleging breach of contract, fraud, mismanagement, and related claims.

The district court, by order dated September 28, 2001, certified 24 parallel classes — one against each of 23 agents and one against the claims administrator — but left for individual trials numerous claims, numerous issues within class-action claims, and all damage issues, concluding that approximately 1,400 mini-trials will be required.

We granted the defendants' motion to review this order under Federal Rule of Civil Procedure 23(f).

Although discovery has not been completed and the facts have not yet been fully developed, it appears that the Fidelity Group intended to create and market a multi-employer healthcare plan that would be available to small businesses and individuals and that would be sub-

ject to regulation by the provisions of ERISA. To do this, it created both the National Association of Business Owners and Professionals ("NABOP") to act on behalf of potential business customers and the International Workers Guild, Inc., a union to act on behalf of the business customers' employees and other individuals who might elect coverage under the Plan. NABOP and the International Workers Guild thereafter "negotiated" the Plan to provide healthcare and dental benefits to Plan participants and beneficiaries. The Fidelity Group, through NABOP, then entered into a contract with Third Party Claims Management, Inc. ("TPCM")[2] to administer the Plan and process claims. Under this contract, effective April 1, 1995, TPCM became responsible for processing incoming claims, determining each claimant's eligibility for coverage, computing benefits payable, and paying claims out of a bank account maintained by the Fidelity Group and NABOP.

Plaintiffs allege that over the next three years, the Plan's administration became deficient, causing a backlog in the processing and paying of claims, ultimately contributing to the Plan's becoming underfunded and to its demise. There is evidence in the record to support allegations that TPCM did a poor job of paying claims, sometimes losing claims and other times adjusting or "adjudicating" claims that should not have been adjudicated. TPCM admits that it did not have a sufficient number of trained claims examiners to stay current with claims being filed, and, as a result, a backlog in claims processing developed that grew to six to eight months. Plan members began to complain widely of the delays in the processing of their claims.

During the same period that TPCM was administering the Plan in this case, it was also experiencing a claims backlog for at least ten other clients. There is evidence that TPCM's problems were caused in part by the fact that, during the approximately 20 months it was administering claims under the Plan, TPCM moved its claims administration operations twice, each time requiring new notifications to healthcare providers of the need to forward claims to a new address.

---

[2]At the time of contract, TPCM's name was Millennium HealthCare, Inc., and later TPCM was succeeded by Healthplan Services, Inc. For convenience, I refer to any or all of these entities collectively as "TPCM."

After TPCM failed to reduce the backlog and fulfill its continuing assurances to the Fidelity Group and NABOP that it would correct the deficiencies, NABOP terminated the contract with TPCM for cause, effective May 1, 1997, and the Fidelity Group moved claims administration "in-house," to be handled by Fidelity Claims Management, Inc.

Because there was a serious backlog and Fidelity Claims Management, lacking both experience and expertise, apparently was not prepared to step in as administrator, Plan members continued to suffer delayed payment or nonpayment of their claims. After more than a year of additional frustration by Plan members, the Secretary of Labor commenced an action in 1998 against the Fidelity Group and related companies and individuals in the Eastern District of New York to take control of the Plan's assets and to shut down the Plan's operations. The district court in New York issued a stay, enjoining the prosecution of suits against the Fidelity Group, the Plan, and related corporations and individuals, and it appointed an independent fiduciary to manage the assets. On the fiduciary's request that the Plan be terminated, the New York district court ordered the Plan terminated, effective January 31, 1999.

The plaintiffs commenced this action on September 11, 1998, and the district court followed the New York court and likewise stayed claims against the Fidelity defendants.[3] But, by an order dated December 27, 1999, the district court lifted the stay as to "all non-Fidelity Defendants," allowing prosecution of the claims against TPCM for claims mismanagement and against the selling agents for misrepresenting the Plan. The selling agents are 43 individuals and companies that sold the Plan on behalf of the Fidelity Group to businesses and individuals during the period from August 1995, when the Plan commenced, to July 1997, when the agents were ordered by the South Carolina Department of Insurance to cease marketing the Plan.

In their complaint against TPCM and the 43 selling agents, the plaintiffs alleged (1) violations of the South Carolina Unfair Trade

---

[3]The Fidelity defendants include the Fidelity Group, NABOP, the union that it formed, the Plan, Fidelity Claims Management, and involved executives and employees.

Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*; (2) negligence in undertaking to administer, market, and represent the Plan; (3) fraud in connection with representations made about the formation of the Plan, its benefits, its administration, and its value; (4) negligent misrepresentation, which plaintiffs alleged induced them to purchase and continue to pay for the Plan; (5) breach of contract; (6) civil conspiracy to form, market, and sell a "substantially worthless health care and dental" plan; and (7) violations of RICO, 18 U.S.C. § 1961 *et seq.* The gravamen of plaintiffs' claims against TPCM is that TPCM, under circumstances that vary from plaintiff to plaintiff, breached duties to pay plaintiffs' claims timely and to provide accurate information concerning the status of pending claims. The plaintiffs allege that these breaches not only caused them direct injury but also contributed to the ultimate failure of the Plan, causing them injury on this indirect basis. The gravamen of plaintiffs' claims against the agents is (1) that the agents sold the plaintiffs worthless insurance that did not comply with South Carolina statutory requirements, (2) that the agents were not licensed to sell the Plan, and (3) that they fraudulently or negligently misrepresented the Plan and provided negligent advice regarding the Plan.

For relief, the employer-plaintiffs that provided the Plan benefits to their employees seek return of the premiums paid for "worthless insurance" as well as consequential damages. The employee-plaintiffs enrolled in the Plan seek payment of the benefits to which they were entitled and consequential damages, including damages for mental anguish, loss of enjoyment of life, injury to their reputations and credit ratings, and costs of rectifying delayed payments. All plaintiffs seek punitive damages.

The plaintiffs sought to represent a class of 1,400 persons, consisting of all persons who purchased coverage under the Plan on or after August 15, 1995, who have claims against TPCM and against the agents as a group, and all employees and beneficiaries who had claims during the three-year period it was operating. They also sought to represent agent-specific subclasses with respect to particular negligence and fraud claims against 23 particular agents. In explanation, they alleged:

> Certain claims against the Defendant Agents, including civil
> conspiracy and RICO claims, can be treated on a class-wide

basis. Other claims against the defendant agents may be more agent-specific and may exist only between those class members and the particular Defendant Agent who marketed, sold, or otherwise provided the coverage under the fund to plaintiffs.

As to the other 20 agents — for whom there were no corresponding named plaintiffs — no subclasses were requested.

Troubled somewhat by the problems of granting class treatment as to all asserted claims, the district court granted in part and denied in part plaintiffs' motion for class certification. In doing so, the court left a complex division between individualized claims and claims subject to class-action treatment. Assessing the motion for class certification against the requirements of Rule 23, the court first concluded that the number of class members is "approximately 1,400," which it concluded satisfied the numerosity requirement of Rule 23(a)(1). But on the 23 proposed agent-specific "subclasses," the court acknowledged that the numerosity issue was a close question. As to one agent, the court noticed that only 8 employees were involved, and 2 of them already had filed individual actions against the agent. Another agent had enrolled only 13 to 14 employees. The court acknowledged that "[w]hile these numbers do not definitely constitute a finding of numerosity, Plaintiffs note that the agent Defendants failed to take into account the significant number of dependents that were also covered by the Plan." It found that including dependents, there were 11 members of the class for the one agent and 21 for the other. The court did not examine numerosity with respect to the other 21 agent classes but it observed that they contained more members. It concluded, "[w]hile these numbers may fall on the borderline of numerosity, the court finds that numerosity is met as to these agents."

The court next concluded that the proposed classes satisfied the commonality and typicality requirements of Rule 23(a)(2) and (a)(3), noting that the common issues included (1) whether TPCM mismanaged plaintiffs' claims, (2) whether TPCM's alleged negligence proximately caused the failure of the Plan, and (3) whether the agents misrepresented the Plan to the plaintiffs. The court acknowledged, however, that all claims for "mental anguish or emotional distress" and damage to credit ratings and reputation would have to be decided

individually. The court also acknowledged the potential need for individualized mini-trials on proximate causation specifically relating to the reason for nonpayment of a given claim. This was especially true, the court noted, as to "non-adjudicated unpaid claims for medical bills," i.e., those which had never been analyzed by a claims adjuster.

In evaluating the adequacy-of-representation requirement set forth in Rule 23(a)(4), the court rejected TPCM's contention that plaintiffs could not represent the class adequately because of conflicts of interest among class members. TPCM had argued that there was a conflict between the employer-plaintiffs who purchased insurance coverage for their employees and the employee-plaintiffs who might have a claim against their employers and who would in any event be seeking different relief. The court ruled that the employee-plaintiffs' claims against their employers were not "viable," and, in any event, the employee or employer class members "could opt out of the class."

In considering the requirements of Rule 23(b)(3), the court first concluded that common issues predominated over issues affecting only some of the class members. The court reasoned that, because most of the plaintiffs' unpaid claims had already been "adjudicated," individualized inquiries relating to the proximate cause of plaintiffs' unpaid claims would not be necessary. The court reiterated that causation issues relating to unadjudicated claims could be resolved in the individualized mini-trials necessary also to resolve damages.

As to the 23 agent-specific "subclasses," the court also acknowledged that oral representations and individual reliance tended to suggest individualized treatment of the claims against the agents. Nonetheless, the court concluded that those defenses could be generalized by presumptions and therefore treated on a class-wide basis:

> [A] common sense approach presuming reliance exists may be acceptable in this circumstance. Therefore, in certain cases, "reliance may be presumed for fraud-based common law claims when the alleged omissions and misrepresentations are uniform and material and the class members acted in a manner consistent with reliance."

*     *     *

Even if the court has erred in its analysis and reliance does threaten the predominance of common issues in this case, that threat can be eliminated by bifurcating the issues of reliance where individual inquiries would be proper.

On the superiority requirement of Rule 23(b)(3), the court acknowledged that "[m]anageability of this class action is of particular concern to the court," pointing particularly to the necessity of individual "mini-trials." However, the court then concluded that

The record presently before the court suggests that bifurcation of individualized damages issues and possibly proximate cause issues regarding non-adjudicated claims would not present an unmanageable scenario for the court.

Addressing separately the civil conspiracy and RICO counts, the court concluded that individualized defenses predominated, and therefore it excluded those claims from class-action treatment. It said:

[T]he court notes a significant problem regarding individualized issues inherent where numerous defendants (in fact a class of defendants) are accused of being part of a vertical conspiracy such as the one alleged in this case. These issues arise primarily due to individualized defenses which may be available to the Agent Defendants.

*      *      *

Therefore, the court concludes that individual issues regarding Plaintiffs' conspiracy claims predominate rendering class treatment of all Plaintiffs' conspiracy claims against all Agent Defendants unadvisable.

On the South Carolina Unfair Trade Practices Act count, the court again required individual trials because the statute itself mandates such treatment. *See* S.C. Code Ann. § 39-5-140(a).

After making this overall division between claims and issues for class-action treatment on the one hand and claims and issues for indi-

vidual trials on the other, the court entered the following order certifying this case as a class action:

> It is, therefore, ordered, for the foregoing reasons that Plaintiffs' Motion for Class Certification is conditionally granted as modified by this Order. Specifically, the proposed class of all Plaintiffs for claims against TPCM is conditionally certified (excluding claims under the South Carolina Unfair Trade Practices Act). However, class-wide treatment of Plaintiffs' conspiracy claims against all Agent Defendants is denied. Instead, the court conditionally certifies Plaintiffs' proposed subclasses currently with representatives based on the Agent Defendants as individual classes for all of the Plaintiffs' claims (excluding claims under the South Carolina Unfair Trade Practices Act).

In sum, the court certified 24 distinct and parallel class actions, having rejected any overarching class action against the agents, to try a limited range of claims and issues. The court ruled that individual trials would have to be conducted on:

1) all claims under the South Carolina Unfair Trade Practices Act;

2) all claims alleging civil conspiracy;

3) all claims involving violations of RICO;

4) any reliance issues that could not, as a matter of law, be presumed;

5) all damage issues;

6) claims against the 20 agents with whom no named plaintiffs had dealings;

7) all issues regarding the fact and nature of injury specifically as to plaintiffs' claims of mental anguish and emotional distress, injury to credit rating, and injury to reputation; and

8)    all questions relating to whether plaintiffs' claims were "adjudicated" and to the cause of delayed payment or nonpayment for those not adjudicated.

TPCM and the 23 agent-defendants against whom class actions were certified filed a motion under Federal Rule of Civil Procedure 23(f) for permission to appeal the district court's interlocutory order, and by order dated November 30, 2001, we granted that motion.

## III

It is appropriate to set forth the established principles applicable to consideration of the issues. We have previously held that "[d]istrict courts have 'wide discretion in deciding whether or not to certify a proposed class,'" *Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (quoting *In re A.H. Robins Co.*, 880 F.2d 709, 728-29 (4th Cir. 1989)), but we have noted that this discretion must be exercised "'within the framework of Rule 23,'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). Where, as here, the plaintiffs have sought class certification pursuant to Federal Rule of Civil Procedure 23(b)(3), the plaintiffs bear the burden of proving that the "numerosity, commonality, typicality, representativeness, predominance, and superiority requirements of both Rule 23(a) and (b)(3) are met." *Id.* The placement of this burden upon the parties seeking class certification reflects the principle that a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). Though the issue of manageability of a proposed class action is "peculiarly within [the] discretion" of the district court, *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977), we will nonetheless vacate the certification of a class when plaintiffs have not sufficiently shown the presence of *all* of the Rule 23(a) and (b)(3) requirements.

Every class action must satisfy the four criteria set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Numerosity requires that the class be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The "final three requirements of Rule 23(a) 'tend to

merge,' with commonality and typicality 'serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)). In addition, a class action must satisfy the criteria of Rule 23(b)(1), (b)(2), or (b)(3).

Plaintiffs here have sought certification of a class under Rule 23(b)(3). Because Rule 23(b)(3) is designed for "situations in which 'class-action treatment is not as clearly called for,'" plaintiffs must go beyond satisfying the Rule 23(a) prerequisites and satisfy two additional requirements, "predominance" and "superiority." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) Advisory Committee Notes). To satisfy the predominance requirement, plaintiffs must show that the "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and to satisfy the superiority requirement, they must show that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement is "far more demanding" than Rule 23(a)'s commonality requirement and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Our recent opinions, decided after *Amchem*, recognize this more demanding standard.

In *Broussard*, we vacated a judgment against a defendant franchisor and ruled that certification of the franchisee-plaintiff class was error in an action where the franchisees had asserted claims for breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentation, among others. 155 F.3d at 352. Despite our recognition that the district court had exercised its "broad discretion" in deciding to certify the class, we nonetheless decertified the class because the franchisees had not shown that the commonality and typicality requirements of Rule 23(a) were met. *Id.* at 340-44. The franchisees were "a hodgepodge of factually as well as legally different plaintiffs": they signed different contracts with the defendant, relied upon different alleged oral misrepresentations, exhibited varying degrees of reliance

upon such misrepresentations, and presented factually different bases for tolling relevant statutes of limitations. *Id.* at 343. Moreover, the plaintiffs in *Broussard* alleged damages that were "inherently individualized and thus not easily amenable to class treatment." *Id.* at 342. We acknowledged that although the need for mini-trials on damages is not necessarily fatal to class certification, plaintiffs' claims for lost profits were not a "natural candidate for classwide resolution" because the governing state law required an individual case-by-case analysis of such claims. *Id.* at 343.

Most recently, in *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 149 (4th Cir. 2001), we held that where "[t]he functional equivalent of a full-blown trial on damages causation for each putative class member would be required to determine to which individuals [the defendant] is liable," the predominance requirement of Rule 23(b)(3) is not met. This was an application of the principle we elaborated in *Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977), that predominance may be destroyed when individualized issues regarding damages would require a large number of separate mini-trials. *See id.* at 69 ("[W]here the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created make (the) damage aspect of the case predominate, and render the case unmanageable as a class action") (quotation marks and internal citations omitted).

It is against this background that we must consider the class-action certification.

IV

Presented with a seven-count complaint against TPCM and 43 agents, the majority has affirmed the conditional certification of a class of 1,400 insureds and their families against TPCM under Rule 23(c)(4) to answer only "whether TPCM mismanaged the Fund" and "whether TPCM's mismanagement was *a* proximate cause of the Plan's collapse." *Ante* at 15 (emphasis added).[4] In relying on Rule

_____

[4]The majority's evolving definition of the certified issue now also includes "whether the Fidelity Defendants"—who are not a party to the

23(c)(4) and not the complete analysis of Rule 23(b)(3), the majority fails to answer how these common questions predominate and how this fractured class action advances judicial efficiency. The certified questions do not resolve even a major portion of the issues that must be decided individually, including up to 1,400 mini-trials on damages and causation alongside 1,400 individual full trials on the civil conspiracy claims, RICO claims, and claims under the South Carolina Unfair Trade Practices Act. The majority also concludes that the requirements of Rule 23(a) have been satisfied despite substantial conflicts of interest that are evident based upon the minimal discovery already conducted.

In the majority's view, this case is a near carbon copy of *Central Wesleyan*, a nationwide class action against asbestos manufacturers in which we affirmed the conditional certification of a class. In my view, however, the class certified here, unlike the one certified in *Central Wesleyan*, is a hodgepodge of dissimilarly situated plaintiffs who dealt with the defendants at different times and under different circumstances and who have antagonistic interests. The class here is cobbled together to resolve very little before ultimately relegating the hard questions to individual trials. Although the majority's effort to fashion a certifiable class under our precedents appears, on the surface, to aid the aggrieved plaintiffs, I believe the majority deviates substantially from the requirements of Rule 23, in the end denying procedural fairness to all of the litigants. I begin by demonstrating the plaintiffs' most obvious failure — their failure to show that the common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

The class as approved by the majority consists of employers, employees, and individuals who purchased or used healthcare benefits provided through a Plan sponsored and marketed by the Fidelity Group and related companies over a period of three years. During the course of those three years, claims under the Plan were administered by TPCM during 1996 and part of 1997 and were then administered

---

class that was certified—"also mismanaged the Fund, and whether the Fidelity Defendants' mismanagement was an intervening cause of the Plan's collapse sufficient to relieve TPCM of liability." *Ante* at 15.

in-house by Fidelity during the remainder of 1997 until the Plan's demise in January 1999. Having suffered delayed payment of claims or nonpayment allegedly due to claims mismanagement, with injuries ranging from damaged credit ratings to emotional distress, plaintiffs seek recovery from the administrators of the Plan, the Plan itself, and the 43 agents who sold the Plan. It is the diversity of the factual and legal bases underlying these claims that confounds the plaintiffs' bold effort to resolve them through the class action process. Indeed, the majority recognizes that the individualized inquiries that pervade plaintiffs' claims against the individual agents preclude certification of any classes against them. And both the majority and the district court recognized that plaintiffs' claims based on the South Carolina Unfair Trade Practices Act, RICO, and civil conspiracy must proceed individually. That leaves for potential class certification four of the seven claims against TPCM, which sound in negligence and contract. Yet the evidence that will need to be presented in the class action against TPCM will need to be repeated to some extent in the individual trials against TPCM. For example, the complaint alleges that TPCM, among other defendants, violated the South Carolina Unfair Trade Practices Act by not providing timely coverage and not explaining why payment was delayed. This claim, which must, by statute, be tried individually by each class member, will of course require proof that TPCM was responsible for making payments and did not make such payments to that individual plaintiff in a timely fashion, thereby causing that plaintiff injury. The substantial effort in consolidating the "common question" in this case thus will yield remarkably little in advancing the class members' individual claims toward a resolution.

The majority is persuaded that, despite all of the differences among the class members that require so many individual trials on the most difficult issues, the common question in the class members' claims of whether TPCM's alleged mismanagement of claims "contributed to" or was "a cause" of the Plan's failure "predominate[s] over any questions affecting only individual members" because Rule 23(c)(4)(A) authorizes the certification of individual issues. But this does not fulfill the requirement that whole "action" be scrutinized to determine whether individual claims predominate.

Although I recognize that many — but not all — of the class members' claims require resolution of whether TPCM contributed to the

collapse of the Plan, this is an underwhelming commonality in light of the substantial individualized inquiries necessary to determine liability, not to mention damages. If the court proceeds under the class structure as proposed and determines that TPCM's claims mismanagement was, in fact, a cause of the Plan's failure, the liability inquiry will only have just begun. The subsequent and more difficult questions, to be litigated individually by class members whose claims were handled either by TPCM or Fidelity between 1996 and 1999, would persist, namely, whether the failure of the Plan caused the class member's injury and the more complex question of comparative fault.

Although the class as certified presumes a unified group of plaintiffs proceeding on a single legal theory of indirect liability, the complaint for good reasons asserts differing theories of recovery requiring the presentation of different, even conflicting, evidence, which undermines predominance. Specifically, the complaint alleges two theories of liability against TPCM: (1) direct liability, as to those who, for example, suffered injury to credit ratings solely because of a delayed payment during the time TPCM managed claims, and (2) indirect liability, as to those whose claims went unpaid or were paid late by *Fidelity* as a result of TPCM's prior claims mismanagement. The majority, recognizing that its "single theory" analysis "appears somewhat at odds" with the complaint and inconveniences its analogy to *Central Wesleyan*, has apparently accepted an informal disavowal of the direct theory of liability in appellees' brief. But oral argument clarified that appellees do not disavow anything in their complaint in this regard. At oral argument, appellees' counsel argued: "There is not a single claim, and they can't point to one, where we suggest that Third Party Claims Management did anything with any specific claim wrong." But counsel did not disavow direct liability claims; he simply portrayed direct liability claims as something other than what they are.[5]

---

[5]Questioning by the court at oral argument revealed that plaintiffs' counsel was not *disavowing* anything in the complaint, but rather making the demonstrably false argument that the complaint *never alleged* any direct theory of liability against TPCM:

Judge Motz: You have a *direct* argument when TPCM is still in there.

Counsel: Your Honor, we're not making that argument at all.

Counsel's argument betrays the language of the complaint, which clearly asserts *direct claims* against TPCM:

> Defendant [TPCM] breached their duty [by] . . . failing to timely pay claims submitted to them; . . . charging fees in excess of what was allowed by agreement; failing to inform plaintiffs and other members of the class of their lack of experience and mismanagement of claims processing; failing to provide plaintiffs and other members of the class with accurate information concerning the status of claims submitted; in other words failing to exercise due care in the processing of claims submitted . . . ; in providing misleading, false and/or fraudulent information about why claims were not being paid. . . . As a direct result of Defendants' negligent conduct, the Plaintiffs have been injured in numerous ways.

Judge Motz: Okay, so you're disavowing that argument.

Counsel: We *never made* that argument.

By embracing a disavowal that even plaintiffs' counsel disclaimed he was making, the majority leaves the plaintiffs with only direct liability claims against TPCM out in the cold. As the majority points out, the South Carolina statute of limitations appears to have run on actions for breach of contract and fraud, *ante* at 21. That leaves these plaintiffs who cannot — or prefer not to — proceed on an indirect liability theory to file their own individual actions, and exposes them to arguments that their claims are now untimely. Although equitable tolling might arguably rescue these unwanted plaintiffs from having their claims dismissed, the need potentially to employ such an extraordinary measure only bespeaks the peculiarity of the majority's cutting these plaintiffs' claims out of the complaint to certify the surviving allegations. Perhaps recognizing the severity of holding that the plaintiffs do not assert direct claims, the majority now alternatively states that the plaintiffs "do not seek class certification for any direct claims against TPCM," but this conclusion, too, flies in the face of the complaint and the motion for class certification, both of which seek certification of all claims against TPCM. The direct claims quite clearly inconvenience the majority's analysis.

These allegations assert *direct* claims against TPCM based on individual failures that encompass more than the alternative theory of indirect liability flowing from the Plan's failure.

Because counsel did not disavow the complaint, but simply mischaracterized it, I am unwilling to concede that these claims have been removed from the case. It would be a questionable decision for plaintiffs' counsel to abandon the theory of liability that best suits an identifiable segment of the certified class. For instance, a class member whose claim was simply delayed, but ultimately paid, in 1996, when TPCM was the sole administrator, would have *only* a direct claim against TPCM for mismanagement, as the damage to that plaintiff was in no way related to the collapse of the Plan.[6] Jamming these unfortunate class members' claims into the single-theory class certified here — which purports to proceed *only* on the theory of *indirect* liability — not only requires a representative party to shoulder the more attenuated theory of recovery for some of her fellow class members but also actually *precludes* recovery for those who were in the circumstance where the collapse of the Plan did not cause injury. And even as to class members whose claims were ultimately unpaid, persons who might have a *direct* claim against TPCM find themselves sacrificed by counsel and caught in a class that requires them to show not only that TPCM mismanaged claims but also that the mismanagement led to the failure of the Plan and that the failure of the Plan caused their injuries. This theory may suit some class members, particularly those whose claims went unpaid by Fidelity after the termination of TPCM's contract, but it certainly is not fair to all class members. The majority opinion now precludes *any* recovery by any class member on a direct theory of liability against TPCM, regardless of the merits of their case. *Ante* at 18, 22 ("[C]lass claims against TPCM . . . rest on a single theory: that TPCM's mismanagement of claims contributed to the ultimate collapse of the Plan and so caused Plaintiffs' damage. . . . [Although] somewhat at odds with the Plaintiffs' original complaint . . . Plaintiffs have made abundantly clear on appeal . . . they do not seek class certification for any direct claims against TPCM").

---

[6]Indeed, counsel's reluctance to pursue both direct and indirect claims suggests their inability to represent absent class members whose *only* claims are *direct* claims.

By accepting the plaintiffs' mischaracterization of the complaint — which the majority treats as a disavowal of the direct theory of liability — the majority also tacitly recognizes the conflict that inheres when a single class proceeding on a single theory purports to represent plaintiffs with dissimilar theories of recovery. This court's response to a complex class action complaint alleging differing theories of recovery should not be to prune allegations and entire theories of recovery until a class remotely certifiable emerges. *Cf. Allison*, 151 F.3d at 422 n.17 ("[W]e should not condone a certification-at-all-costs approach to this case for the simple purpose of forcing a settlement"). Rather, we should take the complaint as written, recognizing that the conflicts and complexities obvious from a plain reading counsel that this case be conducted by individual parties or by such small groups of parties as may be appropriate.[7] In my view, the existence of conflicting theories of recovery not only reveals the plaintiffs' failure to demonstrate that the common issues predominate but also reveals the inadequacy of a single representative for these disparate theories.

The majority also never addresses the complex question of comparative fault. For example, a class member whose payment was delayed but ultimately paid in 1996, when TPCM was the sole claims administrator, might prove that TPCM's mismanagement rendered it 100% liable for the class member's injury, whether it be damage to credit rating or emotional distress. In that case, the failure of the Plan would

---

[7]The majority's treatment of the plainly pleaded direct theory of liability is mystifying. Perplexingly, the majority relies upon the liberal theory of pleadings to justify its excision of a pleaded theory of liability from the complaint, seemingly for the convenience of its certification analysis. *Ante* at 22. Having excised that theory of liability from the complaint, the majority then treats with indignation what it calls my "disingenuous" suggestion that rewriting the complaint has done a disservice to an identifiable group of plaintiffs. *Ante* at 23 n.8. Making reference to exceptions to claim-splitting and the opt-out feature of Rule 23 to surround its selective redrafting of the complaint in an air of legitimacy, the majority does little to address why it is fair to any plaintiff to excise a timely pleaded theory of recovery from the complaint, leaving any plaintiffs wishing to assert the theory they thought they had alleged to plead it anew, albeit now likely untimely. I would rather give the plaintiffs the benefit of the fullness of their claims as timely plead, in accordance with the liberal theory of pleadings.

be irrelevant to the cause of the delayed payment. Another class member, whose payment was delayed or went unpaid in the summer of 1997, shortly after claims management went in-house at Fidelity, might ultimately prove that TPCM was 42% or 70% liable, or even 0% liable if TPCM proved that some independent inadequacy of Fidelity caused a particular claim to go unpaid. Yet another class member, whose claim went unpaid in 1999, almost two years after claims administration went in-house, might be able to prove even lesser responsibility on TPCM's part. The evidence necessary to establish comparative fault — evidence regarding what TPCM did wrong in a particular case versus what Fidelity did wrong in that case — would require a second presentation during individual trials of much of the evidence, albeit individualized, that the majority believes the certified class structure allows to be presented only once. And, of course, a given class member's negligence in getting the proper paperwork to the insurer could constitute a cause of delayed payment or nonpayment, which negligence would bar recovery if that negligence exceeded that of the administrator. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 482 S.E.2d 569, 571 (S.C. Ct. App. 1997) ("[A] plaintiff in South Carolina may recover only if his negligence does not exceed that of the defendant's").

Even apart from the direct-indirect claims problem and the individualized comparative liability questions, which include inquiries into intervening causes of maladministration in particular cases, the individual questions of entitlement to payment under the terms of the Plan and the amount of any such entitlement also loom. This would surely require, among other things, submission of proof relating to timely filing of a claim, proof of medical services rendered, and the like. Indeed, some claimants have had their claims qualified for coverage but not payment, and some have not been qualified for coverage. Those whose claims have been adjudicated may challenge the benefits determination, and TPCM has already indicated that it intends to look at the accuracy of individual claims adjudications, if they will be determinative of liability. Those whose claims have not yet been adjudicated would have to establish the facts that would qualify them for coverage, which would include the nature of the illness or injury for which the claim is made, deductibles and exclusions, doctor documentation, and similar matters. And, of course, as the district court noted, in addition to all of this, "an individualized inquiry is necessary

for damages such as damage to one's credit rating as well as emotional distress and mental anguish."

It is thus difficult to conceive what advantage is gained by certifying a class premised on such a sliver of commonality. The individualized evidence necessary to determine (1) comparative liability of TPCM versus Fidelity based, in part, on the date the class member (or medical provider) filed a claim, (2) the class member's (or medical provider's) negligence, if any, in causing the claim to be delayed or go unpaid, (3) any intervening causes of maladministration, (4) the class member's entitlement to payment based on the nature of the services received and whether they are covered, (5) the amount of entitlement, considering copayments due, deductibles, and other sources of benefits, and (6) the existence and amount of other damages, such as mental anguish, will surely require presentation of substantially all of the evidence necessary to make the unhelpful determination that TPCM was *a* cause of the Plan's failure. And to the extent the Plan's failure can be shown to be a cause of a class member's injury — which will not always be the case, of course — there remain questions of whether there were *other* parties potentially responsible for the Plan's failure.

Because the complaint alleges seven distinct causes of action and the district court has determined that approximately one-half of these claims will have to be resolved through individual trials, the resulting complexity itself should counsel against class-action treatment. Neither the district court nor the majority have even begun to address how the trials and mini-trials will proceed; how the law of the case or res judicata will be applied; and how evidence will be received when most of it will relate to various individual plaintiffs, individual defendants, and individual claims. The combination of the various trials — up to 1,400 mini-trials, individual full trials as to all defendants on civil conspiracy, RICO violations, and South Carolina statutory violations, and a class-action trial involving the differing claims against TPCM — will produce a hodgepodge of factual findings and legal rulings, perhaps conflicting, that will have to be sorted out and applied either by the jury or by the court as the law of the case. This will create a minefield for legal error.

Given the overwhelming breadth of the issues reserved for separate full trials and individual mini-trials, I conclude that the common

issues in this case do not predominate over the individual ones. *Amchem*, 521 U.S. at 624 ("Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard").

In addition, the substantial judicial effort required to manage procedurally a case in which the same evidence will be presented to the court both individually and on a classwide basis is not justified by the minimal contribution to the case that an answer to the certified question provides. It is questionable whether, in fact, any time will be saved by certifying the class against TPCM. In any event, the procedural nightmare such a certification invites cannot be thought to come close to satisfying the requirement of Rule 23(b)(3) that the class structure be superior to other available methods of adjudicating the controversy.[8] *See* Fed. R. Civ. P. 23(b)(3).

---

[8]The majority finds comfort in running to the "conditional" aspect of certification, stating that "we are only approving a *conditional* certification of the case, and . . . in the unlikely event the case becomes a 'procedural morass,' . . . we are confident that the district court will . . . decertify the class." *Ante* at 44. This view defaults our responsibility and employs a backward burden in demonstrating the superiority of the class action device. The majority apparently believes that no matter how complex, a complaint comes to the court bearing an entitlement to certification unless the court can prove why it should not be certified. This view is reflected in the court's willingness to excise inconvenient theories of recovery from the complaint and its willingness to elevate Rule 23(c)(4) to allow certification of any common issue, presumably subject to some unspoken limiting principle. But the fact remains that a class action is an "*exception* to the usual rule" that litigation is to be pursued by the individual parties, *Califano*, 442 U.S. at 700-01 (emphasis added), that the party seeking certification *bears the burden* of proving satisfaction of the class-qualifying criteria of Rule 23(a) and (b), and that the court is to measure plaintiff's ability to meet that burden against the action as alleged in the complaint. The alternative I suggest, therefore, is that this case proceed according to the usual rule that the claims be asserted by the individual named parties, and I note the availability of our rules of civil procedure to achieve economy even without a class action. *See* Ben-

Thus, taking the class against TPCM as the district court has defined it in its September 28, 2001 order, one can only conclude (1) that the questions of law or fact common to members of the class do not predominate over the questions affecting individual members and (2) that the class-action process is not superior in this case. The majority's conclusion to proceed with one or two issues to the contrary, through class treatment under Rule 23(c)(4)(A) in my view, enlarges the reach of Rule 23(b)(3) beyond its proper scope because the constraints of predominance and superiority have not been applied.

I also believe that the class, as conditionally certified, does not satisfy the requirement that the class representatives fairly and adequately protect the interests of all of the class members. *See* Fed. R. Civ. P. 23(a)(4). In my view, the majority ignores overt conflicts of interest existing among members of the conditionally certified class. Fundamentally, it does not mention or attempt to explain how the conditionally certified class may include, on one hand, employers seeking rescission of the insurance contract and return of the premiums paid, and, on the other hand, employees seeking enforcement of the insurance contract and benefits due under it. In addition to this conflict, the employee class members have potential common-law claims against their employers, who purchased the Plan, for negligence or for misrepresenting the Plan.[9] The incompatible relief sought by the employers and the employees alone precludes adequate representation of both groups by one representative, and this concern is only heightened by the potential for lawsuits by employees against the

---

jamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harv. L. Rev. 356, 391 (1967)("[T]he procedural alternatives are hardly confined to the class action, on the one side, and the individual uncoordinated lawsuits, on the other; there are often other possibilities ranging from use of a model action to consolidation or coordination of the numerous individual actions for all or selection purposes")(citation omitted).

[9]It may well be, as the majority notes, that many of the claims the employees may have against their employers are now barred by the statute of limitations, depending on what theory of when a third-party claim accrues is applied.

employers. While the majority addressed only some of the conflicts presented, it gave any notion that conflicts are untenable in class representation the back of its hand.

The district court also recognized some of these conflicts but resolved them only with the observation that they could be cured by the class members' right to opt out of the class action. But this observation does not address a fundamental deficiency of a conflict among class members nor the burden that the plaintiffs must carry in seeking to represent the class as a whole, including those who, for whatever reason, never opt out. Federal Rule of Civil Procedure 23(a)(4) requires plaintiffs, as purported representatives of the class, to demonstrate that they can fairly and adequately protect the claims of class members. They obviously cannot fulfill this responsibility if some class members' claims are in conflict with others' claims. *See Amchem*, 521 U.S. at 626-28 (finding the plaintiffs could not fairly and adequately represent a class where, within the class, there was a "disparity between the currently injured and exposure-only categories of plaintiffs" making asbestos claims).

Given the relatively insubstantial common issues shared by only some of the class members and the irreconcilable conflicts of interest inhering in the certified class, I do not agree with the majority that this case is "strikingly similar" to *Central Wesleyan*. *Central Wesleyan* was an asbestos removal case in which 16-23% of America's colleges and universities were potential class members and which involved dozens of defendants and hundreds of asbestos products sold over decades. 6 F.3d at 181, 189. The issues conditionally certified for class treatment were "primarily factual," *id.* at 189, in a context where "the sheer volume of litigation" in the area impelled many courts nationwide to conclude tentatively that class treatment of certain common factual issues in this very particular type of litigation advanced judicial economy and fostered settlement, *id.* at 181-83, 185. Conditionally certifying the primarily factual questions for class treatment, the court held, would relieve the colleges and universities of the need "to prove over and over when defendants knew or should have known of asbestos' hazards, or whether defendants engaged in concerted efforts to conceal this knowledge, or even whether certain of defendants' products crumble and release dust under hand pressure." *Id.* at 185.

This case is unlike *Central Wesleyan*. This is not a massive nationwide litigation in which resolving certain primarily factual questions on a classwide basis would substantially reduce repetitive factfinding. The only question certified here is whether TPCM was "a cause" of the Plan's failure, which is a mixed question of fact and law, and which, as noted, is only the first step in a causation inquiry that is steeped in necessary individualized determinations requiring the presentation of often duplicative evidence. While the court in *Central Wesleyan* countenanced individualized inquiries as to damages, it noted that the potential for individualized inquiries relating to liability could "pose management difficulties and reduce the judicial efficiency sought to be achieved through certification," indicating that decertification might be warranted. *Id.* at 189. Here, the need for individualized determinations as to causation is not hypothetical or even unique to a few class members but rather is a characteristic of every claim of every class member.

The complexity of this case counsels that our decisions in *Broussard* and *Lienhart* are far more apt comparisons than *Central Wesleyan*, portions of which may even have been superseded by the Supreme Court's analysis in *Amchem*. In both *Broussard* and *Lienhart*, we concluded that the district court abused its discretion in certifying the class. In neither of those actions was there such an array of individual actions that required individual adjudication as those presented in this case. Indeed, in *Lienhart* we stated that the requirement of individual trials on damages causation alone would require a finding that the predominance requirement of Rule 23(b)(3) was not met. 255 F.3d at 149. The majority glosses over the complexities in this case, overlooking what clearly distinguishes this case from *Central Wesleyan*.

Rule 23(b)(3) was designed to effect efficiencies without sacrificing procedural fairness. As the Advisory Committee Notes to the 1966 amendments to Rule 23 state:

> Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

The drafters of Rule 23 understandably counseled a cautious approach with respect to Rule 23(b)(3) classes, recognizing that even under their limited understanding as to how broadly it might apply, the idea was adventuresome and was not "as clearly called for" as class actions under (b)(1) or (b)(2). *See Amchem*, 521 U.S. at 615. This cautious and constricted approach to Rule 23(b)(3) envisioned by its authors should not be relaxed now simply by the passage of time and the additional experience that courts have had with the Rule. Such comfort would tend to transmogrify what is already an adventuresome experiment into one applied for its own sake and not for the sake of procedural efficiency and fairness. As the Court stated in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 861 (1999), "we are bound to follow Rule 23 as we *understood it upon its adoption*, and . . . we are not free to alter it except through the process prescribed by Congress in the Rules Enabling Act." (Emphasis added). Because of its already adventuresome contours, the original understanding of Rule 23(b)(3) class actions clearly contemplated that courts would conduct a "close look at the predominance and superiority criteria." *Amchem*, 521 U.S. at 615. Disapproving any metamorphosis of the rule, the Court stated in *Amchem* that, while a 23(b)(3) class action was thought to be the most adventuresome innovation of the 1966 amendments, *id.* at 614, "[i]n the decades since the 1966 revision of Rule 23, class action practice has become even more 'adventuresome,'" an example of which was before the Court, *id.* at 617.

Although the district court's efforts in patching together a certifiable class against TPCM may be well-intended, energetic, and indeed, even creative, the class is nonetheless far too adventuresome simply to resolve a few common issues, seriously risking the creation of procedural unfairness. Predict as we can how this case might be tried as it is now structured, I see only a queue of problems that sacrifice procedural fairness and have the potential for creating legal error. Without forecasting how the numerous claims might be adjudicated to secure the "just, speedy, and inexpensive determination" of each claim, Fed. R. Civ. P. 1, I conclude that the plaintiffs' effort to proceed against TPCM under Federal Rule of Civil Procedure 23(b)(3), as certified by the district court in its order of September 28, 2001, is neither "convenient" nor "desirable," *Amchem*, 521 U.S. at 615, and that such a structure amounts to an adventuresome embrace that is too enthusiastic for Rule 23's possibilities.

Accordingly, I would vacate the entirety of the district court's order of September 28, 2001, and remand this case for further proceedings.